**NATIONAL SOLID WASTES MANAGEMENT ASSOCIATION, and Chemical Waste Management, Inc., Plaintiffs,**

**v.**

**The ALABAMA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT; Leigh Pegues, as Director of the Alabama Department of Environmental Management; and Guy Hunt, as Governor of Alabama, Defendants.**

Civ. A. No. 89–G–1722–W.

United States District Court, N.D. Alabama, W.D.

Jan. 12, 1990.

Fournier J. Gale, III, Jarred O. Taylor, II, H. Thomas Wells, Jr., and Alfred Franklin Smith, Maynard, Cooper, Frierson & Gale, Birmingham, Ala., Bruce J. Parker and John H. Turner, Nat. Solid Waste Management Ass'n, Washington, D.C., M. Therese Yasdick and Roger C. Zehntner, Chemical Waste Management, Inc., Legal Dept., Oak Brook, Ill., for plaintiffs.

Alton B. Parker, Jr., Bert S. Nettles, Kenneth O. Simon, Maston E. Martin, Jr. and Joseph C. Daniel, Spain, Gillon, Grooms, Blan & Nettles, Birmingham, Ala., Ronald W. Farley, Ala. Dept. of Environmental Management, H. William Wasden, Legal Advisor to Governor, Montgomery, Ala., for defendants.

Charles R. Driggars, Kaye K. Houser, Sirote and Permutt, P.C., Birmingham, Ala., amicus Hazardous Waste Treatment Council.

## MEMORANDUM OPINION

GUIN, District Judge.

During the last four decades the United States has had to reevaluate its attitude toward conservation of its natural resources and protection of the environment. As public awareness has increased, numerous laws to protect the health and welfare of the people and to protect the environment have been enacted. In the early 1950's the Public Health Service Act, 42 U.S.C. § 241 (1970) was passed. By this legislation the Surgeon General was empowered to promote and to coordinate research and studies relating to the causes of pollution and the prevention of diseases resulting therefrom.

In the next decade Congress enacted the Solid Waste Disposal Act of 1965, Pub.L. No. 89-272, title II, 79 Stat. 997, 42 U.S.C. §§ 3251-3259 (1965), which directed the Department of Health, Education and Welfare, under the auspices of the Bureau of Solid Waste Management, "to provide technical and financial assistance to States and local governments ... in the planning and development of resource recovery and solid waste disposal programs." Solid Waste Disposal Act of 1965 § 3255 (Supp. I 1965), *as amended*, 42 U.S.C. § 3254a (1970). The act defined solid waste as "garbage, refuse, and other discarded solid materials, including solid-waste materials resulting from industrial, commercial, and agricultural operations, and from community activities, but does not include solids or dissolved material in domestic sewage or other significant pollutants in water resources." 42 U.S.C. § 3252(4) (1970).

The Resource Recovery Act of 1970 amended the Solid Waste Disposal Act of 1965 to read "(1) to promote the demonstration, construction, and application of solid waste management and resource recovery systems which preserve and enhance the quality of air, water, and land resources; ... (4) to provide for the promulgation of guidelines for solid waste collection, transport, Beparation, recovery, and disposal systems." 42 U.S.C. § 3251(b). This act established the Environmental Protection Agency [hereinafter EPA] which took over the functions of the Department of Health, Education and Welfare's Bureau of Solid Waste Management. Reorg. Plan No. 3 of 1970, 3 C.F.R. 1072 (1966-1970 Compilation), *reprinted in* 84 Stat. 2086 (1970), 42 U.S.C. § 4321 note.

In 1973, the EPA listed Sumter County as a good place for a hazardous waste site because it sits on a thick layer of chalk.[1] White, *Who Ships Toxic Waste?*, The Birmingham News, November 26, 1989, at 1, col. 2.

The Resource Conservation and Recovery Act of 1976 [hereinafter RCRA], Pub.L. No. 94-580, 90 Stat. 2795 (codified at 42 U.S.C.A. §§ 6901-6987 (West Supp.1977), was the congressional response to the solid waste management problem and the public's attitude toward its disposition.

---

1. Water doesn't pass easily through the 700 feet of chalk that lies between the surface and the underground water. Mississippi has the same chalk formations as Alabama. Georgia has lots of clay. White, *Who Ships Toxic Waste?*, The Birmingham News, November 26, 1989, at 1, col. 2 (quoting Buddy Cox who heads the hazardous waste division for the Alabama Department of Environmental Management).

"Everyone wants us to pick up the trash, but no one wants us to put it down." *Symposium on Resource Conservation and Recovery, House Subcomm. on Transportation and Commerce of the House Comm. on Interstate and Foreign Commerce*, 94th Cong., 2d Sess. 6 (1976) (quoted in W. Kovacs,[2] and J. Kluesik,[3] *The New Federal Role in Solid Waste Management: The Resource Conservation and Recovery Act of 1976*, 3–4 Colum.J.Envt'l Law 205, 206 (1977). "The Act's primary focus is on the problems associated with municipal solid waste, government procurement of recovered materials, federal facilities, and hazardous waste." *Id.* at 221.

One objective of RCRA was to "preserve and enhance the quality of air, water, and land resources." 42 U.S.C.A. § 6902(7). To attain this, and other objectives, Congress set four goals: 1) An Office of Solid Waste was established within EPA; 2) A "cradle to grave" system for regulating hazardous waste, to be administered by the federal government unless the states decided to administer the programs, was established; 3) The states were encouraged to establish solid waste control plans including provision for closing open dumps; and, 4) An expanded federal role in research and development was continued. Anderson, *The Resource Conservation and Recovery Act of 1976: Closing the Gap*, 78 Wis.L. Rev. 633, 646 (1978).

Under RCRA, EPA is required to establish minimum federal standards applicable to all who generate (42 U.S.C.A. § 6922), transport (42 U.S.C.A. § 6923), treat, store or dispose (42 U.S.C.A. § 6924) of hazardous wastes. EPA is given the authority to issue administrative orders or to file suit in order to enforce the minimum standards. The provisions relating to hazardous wastes are mandatory. The term "hazardous waste" means nonradioactive hazardous waste. Anderson, 78 Wis.L.Rev. at 639 (1978). RCRA defines it in the following manner:

[A] solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristic may—

(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or

(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C.A. § 6903(5) (West Supp.1977).

Kovacs and Kluesik make the following comments about RCRA:

[W]ith hazardous waste there existed adverse health effects coupled with little market demand for the waste. The congressional intent respecting hazardous waste was to regulate, since without such regulation it would remain economically advantageous to dispose of the hazardous wastes in an environmentally unsound manner. The Act stresses planning and coordination between neighboring jurisdictions and among other environmental laws so that a future crisis, such as cities running out of landfill, shortage of materials, or the poisoning of drinking water supplies can be avoided."

Kovacs and Kluesick, 3–4 Colum.J.Envt'l Law at 223.

In order to implement state plans Congress recognized the necessity of overcoming the states' move toward balkanization over solid waste problems. It, therefore, offered incentives to states to cooperate: financial aid and technical assistance. "If a state does not develop or implement a solid waste management plan for its municipal waste, it does not receive federal financial or technical assistance. Under the Act the EPA has no regulatory authority to require state implementation of any federal standards relating to municipal waste management." *Id.* at 221. If a state does assume the responsibility for implementing

---

**2.** William L. Kovacs is the former Chief Counsel for the United States House of Representatives Subcommittee on Transportation and Commerce.

**3.** John F. Kluesik is the former Special Assistant to the United States House of Representatives Subcommittee on Transportation and Commerce.

and enforcing the RCRA standards, in lieu of EPA, its program must be at least equivalent to the minimum federal standards.[4] "The state standards can be more stringent than the federal standards." Kovacs and Kluesick, 3–4 Colum.J.Envt'l Law at 226. "[I]n states with their own programs, the hazardous waste management requirements may be more stringent than the federal regulations." *Id.* at 228.

While an earlier draft of section 3009 of RCRA was entitled "Preemption of State Law," H.R.Rep. No. 14496, 94th Cong., 2d Sess. (June 22, 1976), when the legislation was enacted, the section was entitled "Retention of State Authority," RCRA § 3009, 42 U.S.C.A. § 6929 (1977), indicating it was not the intention of Congress for RCRA to preempt state law. The most clear-cut reference to preemption in the House report is the following statement: "At this time federal preemption of this problem is undesirable, inefficient, and damaging to local initiative." H.R.Rep. No. 94–1491, 94th Cong., 2d Sess. 33, *reprinted in* [1976] U.S.Code Cong. & Admin.News 6238, 6271. Nor was federal preemption championed by EPA. In *Resource Recovery and Conservation Act of 1976: Hearings on H.R. 14496 Before the Subcommittee on Transportation and Commerce of the Committee on Interstate and Foreign Commerce,* 94th Cong. 2d Sess. (1976) (statement of Shelton Meyers, Deputy Assistant Administrator for Solid Waste Management Programs, Environmental Protection Agency), Mr. Shelton stated:

> We note with interest the bill's emphasis on State primacy in terms of hazardous wastes regulatory program operations. We also believe that strong State regulatory programs are the most effective way to assure appropriate management of state wastes. Thus, the agency does not support a federally operated permit program or total Federal preemption of ineffective State efforts.

Congress directed that the waste regulations must "protect human health and the environment." 42 U.S.C.A. §§ 6922–6924. The regulations do not require EPA to consider economic and technical limitations. "The decision to omit consideration of the economic and technological limitations in the development of the hazardous waste regulations may be found in the legislative history of the Act. As reported from the House Committee on Interstate and Foreign Commerce, H.R.Rep. No. 14496, 94th Cong., 2d Sess. (1976), carried the congressional directive to "reasonably protect human health and the environment." Kovacs and Kluesik, 3–4 Colum.J.Envt'l Law at 226. Since the Senate language differed, the compromise omitted the word "reasonable." The compromise set a tougher standard. RCRA §§ 3002–3004, 42 U.S.C.A. §§ 6922–6924 (West Supp.1977).

Although RCRA does not give EPA authority to limit the creation of hazardous waste, it does give EPA considerable control over its actual management. Kovacs and Kluesik, 3–4 Colum.J.Envt'l Law at 228. States with hazardous waste plans equivalent to EPA standards, however, may manage their own programs. To assist them the act requires that federal guidelines be published. These guidelines are "not to preempt state or local initiatives at managing the problem." H.R.Rep. No. 94–1491, 94th Cong. 2d Sess. 33 (1976); S.Rep. No. 988, 94th Cong., 2d Sess. 10 (1976), 1976 U.S.Code Cong. & Admin. News p. 6271. The act requires that guidelines be set establishing solid waste management regions. RCRA §§ 4002, 4004, 4005, 42 U.S.C.A. §§ 6942, 6944, 6945 (West Supp.1977). The purpose of these guidelines is to "assist States to identify and develop appropriate areas within the State or interstate regions for discarded materials planning." H.R.Rep. No. 1491, 94th Cong., 2d Sess. 32–33 (1976), 1976 U.S.Code Cong. & Admin.News pp. 6270, 6271. To receive federal assistance RCRA requires solid waste regions be established. Regions are based on EPA guidelines such

---

**4.** RCRA § 3009, 42 U.S.C.A. § 6929 (1977) reads: "Upon the effective date of regulations under this subtitle no State or political subdivision may impose any requirements less stringent than those authorized under this subchapter respecting the same matter as governed by such regulation.

as population, geography, volume of waste and means of transportation within the area. RCRA § 4006(a), 42 U.S.C.A. § 6946(a) (West Supp.1977).

RCRA further requires publication of guidelines to prevent ground and surface water contamination. The guidelines are aimed at providing at a minimum for "protection of the quality of ground waters and surface waters from leachates," and "protection of the quality of surface waters from runoff through compliance with effluent limitations under the Federal Water Pollution Control Act." RCRA § 1008(a)(2)(B), (C), 42 U.S.C.A. § 6907(a)(2)(B), (C) (West Supp.1977).

In 1976 Congress expressed additional concern over the environment by passage of the Toxic Substances Control Act of 1976, [hereinafter TSCA] Pub.L. No. 94–469, S.Rep. No. 94–698, 94th Cong., 2d Sess. 4, *reprinted in* 1976 U.S.Code Cong. & Admin.News 4491, 4494, a comprehensive measure to protect the public and the environment from exposure to hazardous chemicals. 1976 U.S.Code Cong. & Admin. News at 4493. In making findings and stating the policy and intent of the legislation, Congress noted the unreasonable risk of injury to health [5] and the environment by exposure to chemicals and found regulation of such chemicals in interstate commerce necessary. *Id.* at 4504.

The Comprehensive Environmental Response, Compensation, and Liability Act of 1980, Pub.L. No. 96–510, 94 Stat. 2767 (codified as amended at 42 U.S.C. §§ 9601–9675 (1982 & Supp. IV 1986) [hereinafter CERLA], also known as the "superfund" law, was enacted in 1980 and revised by the Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99–499, 100 Stat. 1613 (1986) (amending scattered sections of 42 U.S.C. §§ 9601–9675 (Supp. IV. 1986) [hereinafter SARA]. CERLA's "principal purpose is the cleanup of leaking hazardous waste disposal sites." R. Findley & D. Farber, *Environmental Law* 169 (1988). An important part of CERLA is federal negotiation with owners of sites of coopera-

tive agreements for cleanup. *Id.* at 172. These owners, in turn, may seek recovery of cleanup costs from potentially responsible parties. Of particular note is the observation that: "Offsite transport and disposal of the hazardous substances or contaminated materials are least favored where 'practical [on-site] treatment technologies' are available." *Id.* at 172–73.

Pertinent to the case at bar is Section 9604(c)(9) Siting, which reads as follows:

Effective 3 years after October 17, 1986, the President shall not provide any remedial actions pursuant to this section unless the State in which the release occurs first enters into a contract or cooperative agreement with the President providing assurances deemed adequate by the President that the State will assure the availability of hazardous waste treatment or disposal facilities which—

(A) have adequate capacity for the destruction, treatment, or secure disposition of all hazardous wastes that are reasonably expected to be generated within the State during the 20–year period following the date of such contract or cooperative agreement and to be disposed of, treated, or destroyed,

(B) are within the State or outside the State in accordance with an interstate agreement or regional agreement or authority,

(C) are acceptable to the President, and

(D) are in compliance with the requirements of subtitle C of the Solid Waste Disposal Act [42 U.S.C.A. § 1 *et seq.* ]

SARA revitalized CERLA with the establishment of the Hazardous Substances Superfund and funding of an additional 8.5 billion dollars. Note, *Misery Loves Company: Spreading the Costs of CERLA Cleanup,* 42 Vand.L.Rev. 1469 (1989).

In 1984 Congress passed the Hazardous and Solid Waste Amendments of 1984, Pub.L. No. 98–616, H.R.Rep. No. 98–198, 98th Cong., 2d Sess. 5, *reprinted in* 1984 U.S.Code Cong. & Admin.News 5576, 5640,

---

**5.** The act noted adverse effects of toxic chemicals on the human body vary. Included among

the effects are birth defects and genetic damage. 1976 U.S.Code Cong. & Admin.News at 4495.

which established a comprehensive program to regulate the land disposal of hazardous wastes. The act strives to see that hazardous wastes are managed properly and "to ensure that land disposal is used only for those wastes for which it can reasonably by [sic] anticipated to be protective of human health and the environment in the very long term, even if there are no treatment alternatives." Sec. 5, 1984 U.S. Code Cong. & Admin.News p. 5640. Land disposal of hazardous wastes, 1984 U.S. Code Cong. & Admin.News at 5589. Subsection (c) empowers the Administrator to prohibit land disposal of specified hazardous wastes "[b]ased upon the Committee's belief that land disposal is the least desirable management practice." 1984 U.S. Code Cong. & Admin.News at 5590.

Soon thereafter, in May 1985, a nationwide ban prohibited burying liquids in hazardous waste landfills. White, *Is Emelle Safe?*, The Birmingham News, November 27, 1989, at 1, Col. 4.

In the same year Alabama saw a significant increase in hazardous wastes shipped to the Emelle site in Sumter County, an increase of less than 200 million pounds in 1978 to 682 million pounds in 1985. White, *Who Ships Toxic Waste?*, The Birmingham News, November 26, 1989, at 18A, col. 1. Shipments of hazardous waste to Emelle continued to rise from the 1985 level to 912 million pounds in 1986, 1.13 billion pounds in 1987 and 1.10 billion pounds in 1988. *Id.* An estimated 1.6 billion pounds of waste would be buried at Emelle in 1989. *Id.* at 1, col. 2. All of this has resulted in the Emelle site, owned by Chemical Waste Management, Inc. [hereinafter Chem-Waste], having become the largest landfill site where toxic waste is buried for a fee. White, at 18A, col. 1.[6] Shipments, which include more than 100 flammable, corrosive, poisonous or cancer-causing chemicals, *Id.*, at 18A, col. 2, are accepted from America's ten largest companies, 159 military bases and other federal agencies, Alabama Power Company in Birmingham, Reynolds Metals in Sheffield, Occidental Chemical Corp. in Mobile, and 217 other customers in Alabama. *Id.* at 1A, col. 2. Even so, less than three-tenths of one percent of America's toxic waste gets buried at Emelle.[7] *Id.*, at 18A, col. 2.

In response to the "dumping" at Emelle, when faced with the question of whether all of the states should bury their wastes in Alabama or whether they should do something about their wastes, the State of Alabama enacted Act No. 89–788, known as the Holley Bill, to amend Alabama Code section 22–30–11(b) (1975). The purpose of the bill is set forth in the introductory paragraph which reads as follows:

[T]o provide for additional definitions and to prohibit commercial hazardous waste treatment or disposal facilities from accepting hazardous wastes generated in another state which prohibits the treatment, storage, or disposal of hazardous wastes within its own borders, or which refuses or fails to comply with 42 U.S.C. § 9604(c)(9) of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, which requires each state to adequately treat and dispose of all hazardous wastes reasonably expected to be generated within that state over the next 20 years through the establishment of a hazardous waste treatment or disposal facility within the state or through the use of a hazardous waste treatment or disposal facility located outside the state in accordance with an interstate agreement or regional agreement or authority.

Because the court has been asked to determine the constitutionality of the Hol-

6. According to Title III of RCRA entitled Hazardous Waste Management, Resource Conservation and Recovery Act of 1976, Pub.L. No. 94–580, H.R.Rep. No. 94–1491, 94th Cong., 2d Sess. 11, *reprinted in* 1976 U.S.Code Cong. & Admin. News, 6238, many of the wastes can blind, cripple or kill. 1976 U.S.Code Cong. & Admin.News at 6249. They can defoliate the environment, contaminate drinking water supplies and enter the food chain. *Id.*

7. Some of this percentage comes from states that have complied with federal legislation previously outlined. The court, therefore, is being asked to decide whether a partial ban on less than three-tenths of one percent is an onerous burden on interstate commerce.

ley Bill, pertinent portions are set forth fully below:

Sec. 1. The legislature finds that:

(1) The generation, management, and disposal of hazardous wastes is a cause of continuing concern to the citizens of this state;

(2) The State of Alabama has a responsibility to protect the public health, welfare, and safety of its citizens by and through the enactment of laws designed to protect and preserve the environment from the health risks and endangerments associated with the treatment and disposal of hazardous wastes;

(3) The United States Congress, recognizing the serious health threats and risks posed by the treatment and disposal of hazardous wastes to public health and the environment, enacted the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") 42 U.S.C. 9604(c)(9), as amended, which requires that each state demonstrate by October 17, 1989, that is [sic] has adequate capacity to treat, destroy, or secure disposition of all hazardous wastes reasonably expected to be generated within the state over the next 20 years through the establishment of a hazardous waste treatment or disposal facility located within its borders, or through the use of a hazardous waste treatment or disposal facility located outside the state in accordance with an interstate agreement or regional agreement or authority;

(4) In enacting the capacity assurance requirements, Congress recognized that local pressures have impeded the siting of new hazardous waste treatment and disposal facilities in the nation in the past several years, and if the Federal Resource Conservation and Recovery Act as amended ("RCRA") and CERCLA are to work properly, such additional sites must be made available. Since Alabama is already bearing far more than its fair share of the burden of managing hazardous wastes, it is only equitable that new capacity be developed in other states which have failed to assume their own obligations to site such facilities.

(5) Both Congress and the U.S. Environmental Protection Agency have recognized that the capacity assurance provisions of CERCLA would be used to force the development of new capacity to manage hazardous wastes. Implicit in the CERCLA capacity-assurance procedure is a recognition that an importing state might refuse to enter into an agreement with an exporting state, requiring the exporting state to create available capacity through waste reduction or through siting new facilities, or enter into an agreement with another state to manage these wastes;

(6) The State of Alabama has enacted and implemented an approved program for the handling and disposal of hazardous wastes within its borders, known as the "Hazardous Wastes Management and Minimization Act," and has established regulations and guidelines for the treatment, storage, and disposal of all hazardous wastes generated within the state, and continues to evaluate and update those regulations and guidelines;

(7) The State of Alabama, since 1978, has had an adequate capacity for the destruction, treatment, or secure disposition of all hazardous wastes that are reasonably expected to be generated within the state over the next 20 years through the establishment and continued existence of commercial hazardous waste facilities within the state;

(8) The State of Alabama has, since 1978, accepted for treatment and disposal, disproportionate amounts of hazardous wastes generated within the borders of other states which have not taken steps to provide the assurance required by 42 U.S.C. [§] 9604(c)(9);

(9) The constant influx of large volumes of hazardous wastes entering this state over and through congested state, county, and municipal highways and roads, coupled with the ever-increasing potential for traffic accidents and mishaps involving hazardous waste transporters, and the likelihood of leaks, spills, and/or explosions of said hazardous wastes resulting therefrom, altogether pose an un-

reasonable and unjustifiable risk to the health, safety, and welfare of Alabama's citizens;

(10) The State of Alabama lacks the financial resources and trained personnel necessary to cope with the serious dangers and risks associated with the transportation within this state of the ever-increasing volumes of hazardous wastes generated out of state, and, as a consequence, it can no longer adequately insure the safety and protection of its citizens from these hazards;

(11) While the use of landfills for the disposal of hazardous wastes is presently an approved method of hazard[ous] waste management, the federal and state governments are implementing phased bans on land disposal and CERCLA describes the landfilling of wastes as the least desirable regulatory technology;

(12) The State of Alabama has a genuine and significant interest in protecting its citizens and its environment from the unencumbered influx of hazardous waste generated in states which do not responsibly provide for the treatment, storage, and disposal of hazardous wastes within their own borders or which refuse to enter into an interstate or regional agreement to share the responsibilities of safe and effective hazardous waste management as required by CERCLA, as amended;

(13) The State of Alabama is compelled by the actions of other states which refuse to responsibly provide for hazardous waste treatment, storage, and disposal within their own borders or fail to cooperate in an interstate or regional plan for hazardous waste management, to enact legislation establishing a comprehensive waste management program in compliance with CERCLA, and which safeguards against the irresponsibility of other states which do not have adequate hazardous waste management programs by prohibiting the treatment, storage, or disposal of hazardous waste in Alabama which are generated in a state which does not allow hazardous waste treatment or disposal facilities within that state or which has not entered into an interstate or regional agreement to assure availability of hazardous waste treatment or disposal facilities.

(14) The imposition of the requirements contained in this legislation will encourage the development of new waste disposal facilities in other states in accord with the intentions of the Congress in enacting Section 42 U.S.C. § 9604(c)(9), and will have the beneficial effect of reducing, in an orderly manner, the nation's dependence on landfilling as a methodology for disposing of hazardous wastes.

Section 2. *Code of Alabama*, 1975, as amended, § 22–30–11, is hereby amended as follows:

§ 22–30–11(a) The department acting through the commission, is authorized to promulgate, and may revise when appropriate, rules and regulations, guidelines, criteria and standards for all hazardous waste management practices.

(b) *It is unlawful for any person who owns or operates a commercial hazardous waste treatment or disposal facility within this state to dispose or treat any hazardous wastes generated in any state outside the State of Alabama which:*

*(i) prohibits by law or regulation the treatment or disposal of hazardous wastes within that state and which has no facility permitted or existing within that state for the treatment or disposal of hazardous wastes; or*

*(ii) has no facility permitted or existing within that state for the treatment or disposal of hazardous wastes; unless that state has entered into an interstate or regional agreement for the safe disposal of hazardous wastes pursuant to the federal Comprehensive Environmental Response, Compensation, and Liability Act. The department shall establish and maintain a list of states from which hazardous wastes cannot be accepted for treatment or disposal pursuant to this paragraph and there shall be no liability under the paragraph for disposal of wastes from a state until fifteen (15) days after a state has been*

listed by the Department. Such list shall be publicly available and set forth the reasons why each state is listed. The date on which a state is included on such list shall be provided. The list of states shall be revised monthly. The state of generation as shown on the hazardous waste manifest shall be used in determining whether a person has treated or disposed of waste in violation of this subsection, and any person who alters the state of generation on any manifest or misrepresents the state of generation of any hazardous waste for the purpose of circumventing this statute shall be punishable in accordance with Section 22–30–19 herein.

(c) Subsequent to the effective date of this Act, no commercial hazardous waste treatment or disposal facility operating in this state may contract with states other than the State of Alabama in order to satisfy the capacity assurance programs required by 42 U.S.C. § 9604(c)(9) of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended."

(d) For the purpose of this section, the following additional terms are defined:

(1) AGREEMENT. Any interstate or regional contract agreement made pursuant to capacity assurance requirements of Section 42 U.S.C. § 9604(c)(9) of CERCLA and which one of the signatories to such contract or agreement is the State of Alabama.

(2) COMMERCIAL HAZARDOUS WASTE TREATMENT OR DISPOSAL FACILITY. A facility which receives for disposal only, or for treatment and disposal, hazardous wastes that are not generated on-site and to which facility a fee is paid or other consideration given for such treatment or disposal.
. . . .

(4) REGION(AL). Region(al) shall mean any or all of the following states: Alabama, Arkansas, Florida, Georgia,

Kentucky, Louisiana, Mississippi, North Carolina, South Carolina, and Tennessee.

(5) STATE OF GENERATION. A state of the United States in which the hazardous waste is generated in the form in which it is received by a commercial hazardous waste treatment or disposal facility located in Alabama for treatment or disposal.

Pursuant to the enactment of the Holley Bill,[8] in September 1989, Alabama banned importation of shipments of hazardous waste which had originated in states which have laws or regulations prohibiting the treatment or disposal of hazardous waste within their states and which have no facility permitted or existing within that state for the treatment or disposal of hazardous waste or which have not entered into an CERCLA agreement with Alabama. Although the ban prohibited importation of hazardous waste from some 22 states and the District of Columbia, it, nevertheless, affected less than three-tenths of one percent of the waste previously disposed of in Alabama.

Plaintiffs contend the Holley Bill is violative of the Constitution because it places restrictions on waste moving in interstate commerce. U.S. Const. art. I, section 8. In order to withstand this attack the state statute must require a legitimate local public interest in the regulation. Anderson, 78 Wis.L.Rev. at 707. Plaintiffs rely on the holding in Philadelphia v. New Jersey, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), in which the court struck down a New Jersey statute prohibiting the importation of most solid or liquid waste which originated or was collected outside the territorial limits of the state as violative of the commerce clause. The court reviewed the statute in light of passage of RCRA. The court found that state law had not been preempted by the federal legislation. It concluded that there was no "general incompatibility [between the New Jersey

---

**8.** The Holley Bill was passed by the Alabama House April 26, 1989, and by the Alabama Senate on May 4, 1989. Governor Guy Hunt signed the bill May 11, 1989. Except for Section 2(c) which became effective immediately upon enactment, the act became effective 120 days after its passage.

statute and] basic federal objectives." *Id.* 98 S.Ct. at 2534 n. 4, 57 L.Ed.2d at 480 n. 4. The court scrutinized the statute to determine whether it was basically a protectionist measure or a law directed toward legitimate local concerns which affect interstate commerce. The New Jersey Supreme Court interpreted the statute to be protective of the state's environment, not her economy, and that its substantial benefits outweighed the burden on interstate commerce. The Supreme Court found that whatever the legislative purpose it was not relevant to the constitutional issue if the statute discriminated against interstate commerce, "unless there is some reason, apart from their origin, to treat them [out of state waste] differently." *Id.* 98 S.Ct. at 2537, 57 L.Ed.2d at 483. The court held the New Jersey statute violated the commerce clause. New Jersey was not allowed to isolate herself from the national economy or accord her own citizens preferential access to natural resources located within its borders. *City of Philadelphia* held a state may not impose restrictions on interstate commerce when those restrictions impose on out-of-state commercial interests the full burden of conserving the state's natural resources.[9] "What is crucial is the attempt by one State to isolate itself from a problem common to many by erecting a barrier against the movement of interstate trade." *Id.,* 98 S.Ct. at 2537, 57 L.Ed.2d at 484.

> The harms caused by waste are said to arise after its disposal in landfill sites, and at that point, as New Jersey concedes, there is no basis to distinguish out-of-state waste from domestic waste. If one is inherently harmful, so is the other.

*Id.* 98 S.Ct. at 2538, 57 L.Ed.2d at 485.

Since *City of Philadelphia* there have been other challenges brought under the commerce clause. *Harvey & Harvey v. Delaware Solid Waste Authority,* 600 F.Supp. 1369 (D.Del.1985), was an equal protection and commerce clause challenge

to regulations adopted by the Solid Waste Authority. The plaintiffs alleged the purpose of the act and the regulations drew a distinction between solid waste depending on its geographic origin. The act halted the flow of solid waste generated in other states. Plaintiffs referred to the ruling in *City of Philadelphia* which had held solid waste constituted an item of constituted an item of interstate commerce. The court opined that the rule was not woodenly applied and "is directed only to state regulation whose primary effect is to confer a significant benefit on in-state economic interests or to impose a significant burden on out-of-state economic interests. Accordingly, the question is not merely whether a distinction is drawn but whether there is significant discrimination against out-of-state economic interests." 600 F.Supp. at 1380.

The court distinguished *Harvey* from *City of Philadelphia* by saying that New Jersey prohibited all solid waste, in effect imposing on out-of-state interests the full impact of conserving the natural resources of New Jersey. *Id.* The *Harvey* court concluded the state regulation, purportedly directed toward state health and environment, did not materially favor in-state economic interests in spite of the incidental impact on interstate commerce.

In *J. Filiberto Sanitation, Inc. v. Dept. of Environmental Protection,* 857 F.2d 913 (3d Cir.1988), a solid waste hauler brought action seeking declaratory and injunctive relief with respect to a rule under the New Jersey Solid Waste Management Act which required deposit of waste collected in county at a transfer station for processing and subsequent disposal. The court felt that if the rule were genuinely aimed at the goal of alleviating the trash crisis, and sought to achieve that goal without transferring the burden of the solution to out-of-state interests, it was subject to the balancing test under *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct.

---

9. The Court in *City of Philadelphia* noted that it was expressing no opinion about New Jersey's power, consistent with the commerce clause, "to restrict to state residents access to state-owned resources ... or ... to spend state funds solely on behalf of state residents and businesses." 98 S.Ct. at 2537 n. 6, 57 L.Ed.2d at 484 n. 6.

844, 847, 25 L.Ed.2d 174 (1970). Under *Pike*, the rule would be invalid only if the incidental burden on interstate commerce is excessive in relation to the local benefits. 857 F.2d at 919.

*Lefrancois v. State of Rhode Island*, 669 F.Supp. 1204 (D.R.I.1987) also distinguished *City of Philadelphia*. The court devoted a section to a discussion of the commerce clause. "Congress shall have power ... to regulate Commerce with foreign Nations, and among the several states, and with the Indian tribes...." U.S. Const. art. I, § 8. The interpretation restricting state regulation is referred to as the "dormant" commerce clause. The Supreme Court has developed a two part dormant clause analysis.

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Id.* at 1207 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) (citations omitted).

*Lefrancois* concluded that whatever the purpose of the statute was that it could not be accomplished by discriminating against articles from out of the state on the basis of their origin unless there was some reason to treat them differently. The court concluded that the statute had the effect of closing the Rhode Island borders to out-of-state waste.

In *Hyatt Corp. v. Hyatt Legal Services*, 610 F.Supp. 381 (N.D.Ill.1985), the court discussed the balancing test of *Pike*. In discussing the number of factors involved the court said:

> Most important is the actual effect on interstate commerce. The legitimacy of the local concern, however, is also an important factor. *See Lewis v. BT Investment Managers, Inc.*, 447 U.S. [27] at 36, 100 S.Ct. [2009] at 2015 [64 L.Ed.2d 702 (1980)]. Statutes designed to protect health and welfare are more favored than statutes designed to protect employment and profits.

*Id.* at 384.

*Norfolk Southern Corp. v. Oberly*, 632 F.Supp. 1225 (D.Del.1986), *aff'd*, 822 F.2d 388 (3d Cir.1987), addressed the issue of whether Delaware could enforce the Delaware Coastal Zone Act challenged by proponents of a coal transferring facility in Delaware Bay. Under Commerce Clause standards the court enunciated the "test that forms the touchstone in Commerce Clause analysis," as set by the Supreme Court in *Pike:*

> [W]here the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Id.* at 1232.

In *Reeves, Inc. v. Stake*, 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980), the court held that South Dakota's policy, during periods of cement shortage, of confining sales of state-produced cement to South Dakota residents, was not violative of commerce clause (art. I, § 8, cl 3).

Not only must the court scrutinize the Holley Bill for commerce clause violations, it must determine whether the federal law has preempted the field. In *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984), the court set forth the principles guiding preemption of state laws, set forth below:

Under the Supremacy Clause, US Const, Art VI, cl 2, the enforcement of a state regulation may be pre-empted by federal law in several circumstances: first, when Congress, in enacting a federal statute, has expressed a clear intent to pre-empt state law, *Jones v. Rath Packing Co.,* 430 US 519, 525, 51 L Ed. 2d 604, 97 S Ct 1305 [1309] (1977); second, when it is clear, despite the absence of explicit preemptive language, that Congress has intended, by legislating comprehensively, to occupy an entire field of regulation and has thereby "left no room for the States to supplement" federal law, *Rice v. Sante Fe Elevator Corp.,* 331 US 218, 230, 91 L Ed 1447, 67 S Ct 1146 [1152] (1947); and, finally, when compliance with both state and federal law is impossible, *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 US 132, 142–143, 10 L Ed 2d 248, 83 S Ct 1210 [1217–1218] (1963), or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 US 52, 67, 85 L Ed 581, 61 S Ct 399 [404] (1941).

*Id.* 467 U.S. at 698–99, 104 S.Ct. at 2699–2700, 81 L.Ed.2d at 588–89.

Analogous to the situation before the court is the decision reached by the Supreme Court in *Hillsborough County, Fla. v. Automated Medical Laboratories,* 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985), in which the court held that Federal blood plasma regulations did not preempt county ordinances imposing requirements beyond those contained in federal regulations.

Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law. Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143, 10 L.Ed.2d 248, 83 S.Ct. 1210 [1217–1218] (1963), or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,"

*Hines v. Davidowitz,* [312 U.S. 52] supra, at 67, 85 L.Ed. 581, 61 S.Ct. 399 [404]. See generally *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 698–699, 81 L.Ed.2d 580, 104 S.Ct. 2694 [2699–2700] (1984).

471 U.S. at 713, 105 S.Ct. at 2375, 85 L.Ed.2d at 721.

The question whether the regulation of an entire field has been reserved by the Federal Government is, essentially, a question of ascertaining the intent underlying the federal scheme. See supra, [471 U.S.] at 712–713 [105 S.Ct. at 2374–2375], 85 L.Ed.2d at 720–721. In this case, appellee concedes that neither Congress nor the FDA expressly preempted state and local regulation of plasmapheresis.

471 U.S. at 714, 105 S.Ct. at 2375, 85 L.Ed.2d at 722.

The FDA possesses the authority to promulgate regulations under this legislation. *Hillsborough* held that the court's analysis would be different had Congress not delegated to the FDA the administration of the federal program. 471 U.S. at 721, 105 S.Ct. at 2379, 85 L.Ed.2d at 726.

This was followed the next year by *Ensco, Inc. v. Dumas,* 807 F.2d 743 (8th Cir. 1986), in which a waste disposal company challenged an ordinance prohibiting storage, treatment, or disposal of hazardous waste. The court concluded:

We agree with the County that the language in section 6929 prevents a conclusion that Congress through the RCRA preempted all state and local regulation of hazardous waste disposal. *Cf. Hillsborough County v. Automated Medical Laboratories,* 471 U.S. 707, 105 S.Ct. 2371, 2375–76, 85 L.Ed.2d 714 (1985) (agency in issuing regulations under Public Health Service Act had declared that state and local authority was not intended to be preempted); *City of Philadelphia v. New Jersey,* 437 U.S. 617, 620–21 n. 4, 98 S.Ct. 2531, 2533–34 n. 4, 57 L.Ed.2d 475 (1978) (no clear congressional intent in RCRA to preempt entire field of interstate waste management or

transportation). Even where concurrent regulation is not totally precluded, however, state and local enactments are nullified to the extent they actually conflict with federal law. *Hillsborough County,* 105 S.Ct. at 2375. A conflict exists when the local enactment " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Id.* (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)).

. . . .

The RCRA emphasizes the need for safe disposal and treatment of hazardous waste and grants to the EPA the authority to develop and detail appropriate waste procedures and to outlaw less healthful practices.

*Id.* at 744–45.

The legislative history of environmental law indicates Congress intended to build a program to protect the environment and the health and welfare of the citizenry without preempting earlier acts and without preempting the states in the field of environmental protection. While states are required to comply with minimum restrictions, no language prevents them from requiring more stringent standards.

■ Having scrutinized the Alabama statute, the court is of the opinion that the law is directed toward a legitimate state concern: an effort to comply with the 20 year CERCLA capacity assurance directive and more importantly to assure that all hazardous waste buried in Alabama is treated and disposed of in the most environmentally protective manner, as is the hazardous waste generated in-state.[10] It is not an effort to isolate Alabama from the national economy. Alabama's statute does not close its borders to all out-of-state waste, only to out-of-state waste from states that are not in compliance with federal law. As soon as they are in compliance the borders will be opened to them.

Nor is the court of the opinion that the effect of the Holley Bill confers a "signifi-cant benefit on in-state economic interests" or imposes "a significant burden on out-of-state economic interests." (*Harvey* interpretation of *City of Philadelphia* previously discussed). The court holds there is not significant discrimination against out-of-state economic interests sufficient to warrant striking the Holley Bill as unconstitutional.

Alabama's act, unlike the New Jersey one heard by the court in *City of Philadelphia,* does not prohibit importation of all solid waste. It does not have the effect of closing its borders to all out-of-state waste. The ban is directed toward protection of the health and welfare of the people and preservation of the environment while encouraging compliance with federal legislation. Its aim is to prevent Alabama from becoming the dumping ground for those states that refuse to "clean up their act" under federal law. Its impact on interstate commerce is incidental and not excessive in relation to the local benefits. (*Pike; Lefrancois.*)

Nor is the Alabama statute an effort to preserve a natural resource, its landfill, at the expense of the rest of the nation. It is not an effort to hoard natural resources by denying entry of nonconforming, out-of-state waste to its waste sites. It has not restricted access to those states that have complied with federal law. It has not forbidden either the passage of out-of-state waste across its borders or the deposit of such waste at the Emelle landfill except for waste coming from nonconforming states. The competitive plight of the plaintiffs in the above-styled action cannot be laid at the feet of Alabama. It is attributable to the nonconforming states for not passing necessary legislation or otherwise cooperating toward solution of the problem. *See Waste Aid Systems, Inc. v. Citrus County, Florida,* 613 F.Supp. 102 (D.C.Fla.1985) (The county ban against acceptance of out-of-county waste at county's solid waste disposal landfill did not result in a "hoarding" of a natural resource, where county neither

---

**10.** Hazardous waste generated in Alabama is regulated by the Hazardous Waste Management and Minimization Act. Regulations and guide-lines for the treatment, storage, and disposal of all hazardous wastes generated in the state are continually evaluated and updated.

refused access to all its landfills nor forbade transportation of out-of-county waste through its borders). In the primary case relied upon by the plaintiffs *Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), hoarding occurred when the defendant state forbade entry of waste generated outside the state, thus closing "its borders to all waste from other States." 437 U.S. at 619, 98 S.Ct. at 2533. Alabama has not closed its borders to all waste from other states, but has only limited its available landfills to those states that are cooperating in an effort to control the environment and protect the health and safety of citizens of all states pursuant to Congress's plan. The landfills are, therefore, not hoarded.

For the above stated reasons the court holds that Act No. 89–788, Code of Alabama 1975, § 22–30–11(b), the Holley Bill, does not violate the commerce clause of the Constitution.

Neither does the Holley Bill violate the supremacy clause of the Constitution. None of the environmental legislation enacted expresses a clear intent to preempt state law. Case law and legislative history indicate there was no such intent. Absent any intention to preempt the field, and there being no conflict between the Alabama statute and federal legislation which would make compliance with both a physical impossibility, the court holds that the Alabama statute does not violate the supremacy clause of the Constitution.

Neighboring states have long benefited from Alabama's foresight and industry in developing means for hazardous waste disposal and its minimization. To allow them to continue to avail themselves of waste sites in Alabama when they have done nothing toward implementation of the federal policies herein discussed would defeat the very intent of the federal legislation. To hold that either the commerce clause or the supremacy clause of the Constitution mandates Alabama's borders be opened to all threatens the future fashioning of effective and creative programs for cleaning up hazardous waste sites and providing for the safest means of disposal. Unless those nonconforming states are forced to comply with federal legislation, they will continue to do the locally popular thing: transport the waste to Alabama or other conforming states.

For the reasons set forth in this opinion, the court grants summary judgment in favor of the defendants. An order consistent with the opinion is being entered contemporaneously herewith.

### FINAL ORDER

This cause comes before the court on the motion for preliminary injunction which this court converted into simultaneous motions for summary judgment ex mero motu at the October 16, 1989, preliminary injunction hearing. Having considered the motions, the pleadings, the submissions and arguments of counsel, and the applicable law, the court is of the opinion that Act No. 89–788, *Ala. Code* § 22–30–11(b) (1975) [the Holley Bill], is constitutional. It is of the further opinion that judgment is due all defendants as a matter of law, there being no just reason for delay in entering a final judgment. Accordingly, in conformity with the memorandum opinion being entered contemporaneously herewith, it is

ORDERED, ADJUDGED and DECREED that the motion of the defendants for summary judgment be and it hereby is GRANTED. It is

FURTHER ORDERED, ADJUDGED and DECREED that Act No. 89–788, *Ala. Code* § 22–30–11(b)(1975) [the Holley Bill], and the ensuing LDR regulations and emergency regulations be and they hereby are DECLARED constitutional. It is

FURTHER ORDERED, ADJUDGED and DECREED that the plaintiffs' motion for summary judgment be and it hereby is DENIED. It is

FURTHER ORDERED, ADJUDGED and DECREED that issuance of a permanent injunction enjoining defendants from enforcing, applying, or attempting to enforce the Holley Bill, the LDR regulations and the emergency regulations be and it hereby is DENIED. It is

806

FURTHER ORDERED, ADJUDGED and DECREED that FINAL JUDGMENT be and it hereby is ENTERED in favor of the defendants, and the plaintiffs shall have and recover nothing of the defendants in this action.

DONE and ORDERED.