NATIONAL SOLID WASTES MANAGE-
MENT ASSOCIATION, and Chemical
Waste Management, Inc., Plaintiffs–Ap-
pellants,

v.

The ALABAMA DEPARTMENT OF EN-
VIRONMENTAL MANAGEMENT;
Leigh Pegues, Individually and as Di-
rector of the Alabama Department of
Environmental Management; and Guy
Hunt, Individually and as Governor of
Alabama, Defendants–Appellees.

No. 90–7047.

United States Court of Appeals,
Eleventh Circuit.

Aug. 8, 1990.

by designation.

Fournier J. Gale, III, H. Thomas Wells, Jr., Alfred F. Smith, Jr., Maynard, Cooper, Frierson & Gale, Birmingham, Ala., for plaintiffs-appellants.

Kaye K. Houser, Sirote & Permutt, P.C., Birmingham, Ala., for Hazardous Waste Treatment Council.

Bert Nettles, Alton B. Parker, Jr., Kenneth O. Simon, Spain, Gillon, Grooms, Blan & Nettles, Birmingham, Ala., for defendants-appellees.

Anne S. Almy, Asst. Atty. Gen., Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., amicus curiae, for plaintiffs-appellants.

Roger C. Zehntner, John T. Van Gessel, Chemical Waste Management, Inc., Oak Brook, Ill., for Chemical Waste Management.

E. Dennis Muchincki, Chief, Office of Atty. Gen., Environmental Enforcement Section, Columbus, Ohio, for amicus curiae, State of Ohio.

Before EDMONDSON, Circuit Judge, and HILL[*] and HENDERSON, Senior Circuit Judges.

EDMONDSON, Circuit Judge:

The United States' largest and Alabama's only commercial hazardous waste management facility is located at Emelle, Alabama. The owner and operator of this facility, Chemical Waste Management, Inc. ("ChemWaste"), along with the National Solid Wastes Management Association, a trade association representing the waste management industry, brought this action seeking declaratory and injunctive relief, against the Alabama Department of Environmental Management; Leigh Pegues, Director of the Department; and Guy Hunt, Governor of Alabama (collectively referred to as "defendants" or "Alabama").

The suit challenges Ala.Code § 22-30-11 (Supp.1989), known as the "Holley Bill," which prevents commercial waste management facilities like Emelle from accepting hazardous wastes generated in states other than Alabama unless the other states have met certain statutory requirements. Plaintiffs also challenge two sets of Alabama regulations that require generators of hazardous wastes to receive the state's preapproval before shipping wastes to management facilities in Alabama and that require certain wastes to be pretreated before disposal. See Ala.Admin.Code rr. 14-3-.08 & 14-9-.03 (1989). Before the challenged acts became effective, the Emelle facility accepted hazardous wastes for treatment, storage, and disposal from forty-eight states; eighty-five percent of the wastes disposed of at Emelle were generated outside Alabama.

Plaintiffs challenge the Alabama legislative and administrative acts on two grounds: that the acts are preempted by federal laws and regulations, and that the acts violate the commerce clause of the United States Constitution.[1] The district court granted summary judgment for defendants, finding the challenged actions to be constitutional. 729 F.Supp. 792. We have plenary review over the district court's decision. See Buxton v. City of Plant City, Fla., 871 F.2d 1037, 1040 (11th Cir.1989).

In deciding this case, our job is not to make policy, but to interpret the federal legislation and regulations to determine Congress's intent and to interpret Alabama's legislative and administrative acts to determine whether they are consistent with the Constitution and the federal environmental statutory scheme. We recognize that serious problems associated with hazardous waste management plague our

---

[*] See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

[1]. Plaintiffs' complaint also alleged that the acts violated the due process, takings, and contract clauses of the Constitution. The district court did not discuss these claims in its opinion, and we do not address the claims because we grant plaintiffs' requested relief on other grounds.

nation; but whatever our own views may be about the effectiveness of what Congress or Alabama has done, we can only apply the law. We accordingly vacate the district court's grant of summary judgment for defendants on the Holley Bill and on the regulations requiring preapproval because those acts violate the commerce clause. We vacate summary judgment for defendants on the regulations that require pretreatment, to the extent those regulations are dissimilar from regulations promulgated by the Environmental Protection Agency ("EPA"), because Congress has preempted Alabama's actions.

## I. THE HOLLEY BILL

### A. BACKGROUND

In 1980, the United States Congress enacted the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601–9675 (1982 & Supp. V 1987) ("CERCLA"), designed to accomplish the cleanup of hazardous waste sites. CERCLA established liability standards for persons responsible for unsafe hazardous waste sites and created "Superfund," a fund that the federal government can use when responsible parties do not conduct the cleanups. *See* 42 U.S.C. § 9607. CERCLA provides for two types of cleanup actions: *remedial* actions, which are generally long-term or permanent containment or disposal programs, 42 U.S.C. § 9601(24); and *removal* efforts, which are usually short-term cleanup arrangements of a more immediate nature, 42 U.S.C. § 9601(23).

"A critical step in the implementation of a rational, safe hazardous waste program is the creation of new [hazardous waste disposal] facilities." 132 Cong.Rec. S14,-924 (daily ed. Oct. 3, 1986) (statement of Sen. Chafee). Because Congress perceived that few states had developed programs to assure continued disposal capacity in the long run, Congress amended CERCLA in 1986 by enacting the Superfund Amendments and Reauthorization Act ("SARA"), Pub.L. No. 99–499, 100 Stat. 1613 (codified in scattered sections of 10, 26 & 42 U.S.C.). "Congress was concerned that certain states, because of political pressures and public opposition, were not able to create and to permit sufficient facilities within their borders to treat and securely dispose of (or manage) the amounts of wastes produced in those states." Office of Solid Waste and Emergency Response, U.S. EPA, *Assurance of Hazardous Waste Capacity: Guidance to State Officials* [hereinafter "EPA Guidance Doc."], at 2 (Dec. 1988). *See* S.Rep. No. 11, 99th Cong., 1st Sess. 22 (1985) ("Pressures from local citizens place the political system in an extremely vulnerable position.... The broader social need for safe hazardous waste management facilities often has not been strongly represented in the ... process [of creating new facilities]. A common result has been ... no significant increase in hazardous waste capacity over the past several years.").

The provision of SARA at issue in this case, section 104(c)(9), 42 U.S.C. § 9604(c)(9), requires that each state present a proposal to EPA showing that the state will have adequate capacity available to dispose of the hazardous wastes generated within the state for the next twenty years.[2] If the state does not provide such capacity assurances deemed ade-

---

**2.** The full text of section 104(c)(9) is as follows:

(9) Siting

Effective 3 years after October 17, 1986, the President shall not provide any remedial actions pursuant to this section unless the State in which the release occurs first enters into a contract or cooperative agreement with the President that the State will assure the availability of hazardous waste treatment or disposal facilities which—

(A) have adequate capacity for the destruction, treatment, or secure disposition of all hazardous wastes that are reasonably ex-

pected to be generated within the State during the 20–year period following the date of such contract or cooperative agreement and to be disposed of, treated, or destroyed,

(B) are within the State or outside the State in accordance with an interstate or regional agreement or authority,

(C) are acceptable to the President, and

(D) are in compliance with the requirements of subtitle C of the Solid Waste Disposal Act [42 U.S.C. § 6921 et seq.]

42 U.S.C. § 9604(c)(9) (brackets in original).

quate by EPA,[3] the state is prohibited from receiving Superfund money for remedial cleanup actions taken within the state.[4]

Congress recognized that—because of geological factors or for other reasons—every state may not be able to create new disposal facilities within its borders and will not be able to dispose of its own wastes within its own borders for the next twenty years. SARA contemplates that a state may meet its section 104(c)(9) capacity assurance requirements by planning to use other states' disposal facilities and privately owned disposal facilities. 132 Cong.Rec. S14,924 (daily ed. Oct. 3, 1986) (statement of Sen. Chafee). Section 104(c)(9) provides that a state may base its capacity assurance plan on such facilities if the state has entered into an agreement for the use of those facilities. 42 U.S.C. § 9604(c)(9)(B). For example, a state that cannot safely dispose of its wastes within its borders (an exporting state) may reach agreements with another state or group of states (importing states) under which the importing states agree to allocate a portion of their disposal capacity to the exporting state. An exporting state may also contract with a privately owned waste management facility. *See* EPA Guidance Doc. at 3; S.Rep. No. 11, 99th Cong., 1st Sess. 22 (1985). SARA places the burden of making capacity assurances on the exporting (waste gen-

erating) state, and not on the importing state. SARA nowhere requires that an importing state enter into interstate or regional agreements, but most states will need to enter into such agreements because most states lack the capacity to dispose of all types of hazardous wastes within their borders.[5]

In the light of SARA's capacity assurance requirement and the concern of Alabama's leaders over the large amounts of other states' hazardous wastes being disposed of in Alabama,[6] the Alabama legislature in 1989 enacted Ala.Code § 22-30-11, popularly called the "Holley Bill." This provision prohibits the owner or operator of a commercial hazardous waste management facility located in Alabama from treating or disposing of hazardous wastes generated in a state other than Alabama, if the other state either (1) prohibits the treatment or disposal of hazardous waste within its borders and has no facility for such; or (2) has no facility existing within that state for the treatment or disposal of hazardous waste and has not entered into an interstate or regional agreement for the disposal of its wastes to which Alabama is a signatory. The Holley Bill also prohibits commercial waste management facilities in Alabama from contracting with a state other than Alabama to satisfy the other state's capacity assurance obligation.[7]

**3.** States were required to submit a plan to EPA by October 17, 1989. 42 U.S.C. § 9604(c)(9). EPA contemplates that states will update these plans every two years because of the difficulties of projecting waste generation and of planning for waste disposal twenty years into the future. EPA Guidance Doc. at 6–7.

**4.** The availability of funds for *removal* actions is not affected because these are emergency actions to cleanup hazardous wastes posing an immediate threat. Funds are withheld for the long-term, permanent cleanup of sites on the National Priorities List. S.Rep. No. 11, 99th Cong., 1st Sess. 22 (1985).

**5.** For example, a regional agreement between Alabama, Kentucky, South Carolina, and Tennessee allows Tennessee and Kentucky to use excess landfill capacity in Alabama and South Carolina. The agreement also allows the other three states to use Tennessee's excess aqueous treatment capacity and to use Kentucky's excess incineration capacity.

**6.** During 1987, Alabama industries shipped about 57,000 tons of hazardous waste out of state for management, but the state imported about 500,000 tons of hazardous waste for treatment and disposal. Letter, dated July 27, 1989, to The Honorable Buddy Roemer, Governor of Louisiana, from Leigh Pegues. R–I–17–Exh. F. In a press release announcing enactment of the Holley Bill, Governor Hunt said that Alabama was "becoming the waste dump of the nation." *Gov. Hunt Announces States that are Prohibited from Shipping Hazardous Waste to Alabama,* Press Release, Aug. 29, 1989, at 2. R–I–17–Exh. G.

**7.** The Holley Bill states, in pertinent part:
(b) It is unlawful for any person who owns or operates a commercial hazardous waste treatment or disposal facility within this state to dispose or treat any hazardous wastes generated in any state outside the state of Alabama which:
(i) Prohibits by law or regulation the treatment or disposal of hazardous wastes within

Under authority of this bill, Alabama has issued a "blacklist" which, on September 13, 1989 (the effective date of the Holley Bill), precluded Emelle from accepting hazardous wastes from twenty-two states and the District of Columbia.[8] Between January 1, 1989 and October 1, 1989, Emelle received wastes from seventeen of the twenty-two states on the Holley Bill's blacklist. In addition, Emelle has ongoing contracts with waste generators in most of the banned states.

### B. THE COMMERCE CLAUSE

■ Plaintiffs contend that the Holley Bill violates the commerce clause of the United States Constitution. U.S. Const., Art. 1, § 8, cl. 3. We agree. As discussed below, we hold that hazardous waste is an object of commerce, that the Holley Bill erects a barrier to the interstate movement of hazardous wastes, and that Congress did not—by enacting the SARA amendments to CERCLA—authorize this restriction on interstate commerce.

#### 1. *Object of Commerce*

"All objects of interstate trade merit Commerce Clause protection; none is excluded by definition at the outset." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 622, 98 S.Ct. 2531, 2534, 57 L.Ed.2d 475 (1978). But when the dangers inhering in an object's movement "far outweigh[ ]" its worth in interstate commerce, a state can prohibit transportation of the object across state lines. *Id.* For example, the Supreme Court has said that a state may restrict interstate movement of an object when, on account of the object's "existing condition, [it] would bring in and spread disease, pestilence, and death." *Bowman v. Chicago & Northwestern R. Co.*, 125 U.S. 465, 489, 8 S.Ct. 689, 700, 31 L.Ed. 700 (1888) (striking down state prohibition on interstate movement of liquor); *see also Clason v. State of Indiana*, 306 U.S. 439, 442, 59 S.Ct. 609, 611, 83 L.Ed. 858 (1939) (upholding Indiana's prohibition against interstate transportation of large dead animals because "obvious purpose of the enactment [was] to prevent the spread of disease and the development of nuisances").

The Supreme Court in *City of Philadelphia v. New Jersey* expressly concluded that the interstate movement of solid and liquid wastes is commerce. 437 U.S. at 621–23, 98 S.Ct. at 2534–35. In that case, the Court rejected the lower court's conclusion that the waste was not an object of commerce because it was valueless and could not be put to effective use. The

that state and which has no facility permitted or existing within that state for the treatment or disposal of hazardous wastes; or

(ii) Has no facility permitted or existing within that state for the treatment or disposal of hazardous wastes; unless that state has entered into an interstate or regional agreement for the safe disposal of hazardous wastes pursuant to the federal Comprehensive Environmental Response, Compensation, and Liability Act. The department shall establish and maintain a list of states from which hazardous wastes cannot be accepted for treatment or disposal pursuant to this paragraph and there shall be no liability under the paragraph for disposal of wastes from a state until 15 days after a state has been listed by the department. Such list shall be publicly available and set forth the reasons why each state is listed. The date on which a state is included on such list shall be provided. The list of states shall be revised monthly. The state of generation as shown on the hazardous waste manifest shall be used in determining whether a person has treated or disposed of waste in violation of this subsection, and any person who alters the state of generation on any manifest or misrepresents the state of generation of any hazardous waste for the purpose of circumventing this statute shall be punishable in accordance with section 22–30–19 herein.

(c) Subsequent to the effective date of Acts 1989, No. 89–788, no commercial hazardous waste treatment or disposal facility operating in this state may contract with states other than the state of Alabama in order to satisfy the Comprehensive Environmental Response, Compensation, and Liability Act, as amended.

(d) For the purpose of this section, the following additional terms are defined:

(1) AGREEMENT. Any interstate or regional contract or agreement made pursuant to capacity assurance requirements of Section 42 U.S.C. § 9604(c)(9) of CERCLA and which one of the signatories to such contract or agreement is the state of Alabama.

. . . .

Ala.Code § 22–30–11.

8. The Holley Bill requires that this list be updated monthly. Ala.Code § 22–30–11(b)(ii).

Court held that the innate danger of the solid and liquid waste did not outweigh its worth in interstate commerce.

Although the hazardous waste involved in this case may be innately more dangerous than the solid and liquid waste involved in *City of Philadelphia*,[9] we cannot say that the dangers of hazardous waste outweigh its worth in interstate commerce. Congress has defined hazardous waste as "a solid waste ... which ... may ... cause, or significantly contribute to a significant increase in mortality or an increase in serious ... illness, or ... pose a substantial present or potential hazard to human health or the environment when *improperly* treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5) (emphasis added). The legislative and executive branches of the federal government together with the separate states have developed a comprehensive scheme for regulating the management of hazardous waste. Waste generators, transporters, and managers must comply with highly technical and rigid rules designed to ensure that the movement of hazardous waste is accomplished with a minimum of danger to the public and to the environment. To the extent these rules can and do provide for the safe transportation of hazardous waste, the dangers associated with hazardous waste movement do not outweigh the value of moving hazardous waste across state lines.

In concluding that hazardous waste is an object of commerce, we follow precedent of this circuit. *See State of Alabama v. United States EPA*, 871 F.2d 1548, 1555 n. 3 (11th Cir.1989) ("To the extent plaintiffs also seem to assert injury based on the out-of-state nature of these wastes [PCBs and other toxic wastes], the Supreme Court

has already held that the commerce clause bars such a distinction." (citing *City of Philadelphia*)), *cert. denied sub nom. Alabama ex rel Siegelman v. United States EPA*, — U.S. —, 110 S.Ct. 538, 107 L.Ed.2d 535 (1989). *Accord Hardage v. Atkins*, 582 F.2d 1264, 1266 (10th Cir. 1978) ("controlled industrial waste," defined in Oklahoma statute as refuse products that are toxic to human, animal, aquatic, or plant life, is within purview of commerce clause). In addition, this conclusion comports with the Holley Bill, which banned the transport of hazardous wastes into Alabama only from certain states, not from all states, thereby suggesting hazardous waste is not inherently too dangerous to be a product in commerce.

### 2. Barrier to Interstate Commerce

Because hazardous waste is an object of commerce and because the Constitution gives Congress the power to regulate the interstate movement of hazardous waste, a state's restriction of that movement is subject to constitutional scrutiny. *See City of Philadelphia*, 437 U.S. at 622–23, 98 S.Ct. at 2535. To determine whether the Holley Bill erects a barrier to interstate commerce, we follow the test set out by the Supreme Court in *City of Philadelphia*:

> [W]here simple economic protectionism is effected by state legislation, a virtually per se rule of invalidity has been erected. The clearest example of such legislation is a law that overtly blocks the flow of interstate commerce at a State's borders. But where other legislative objectives are credibly advanced and there is no patent discrimination against interstate trade, the Court has adopted a much more flexible approach, the general contours of which were outlined in *Pike v.*

---

9. The Supreme Court never described the waste at issue in *City of Philadelphia* as "hazardous"; the Court was apparently considering "solid waste," defined by Congress as: "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities...." 42 U.S.C.

§ 6903(27). The New Jersey statute and regulations, struck down by the Court, closed New Jersey's borders to all such wastes from other states, with the exception of four narrow categories of waste, including garbage fed to swine and municipal solid waste processed into fuel. *See City of Philadelphia*, 437 U.S. at 619 & nn. 2 & 3, 98 S.Ct. at 2533 & nn. 2 & 3 (citing N.J.Stat. Ann. § 13–1I–1 *et seq.* (West Supp.1978); N.J. Admin.Code 7:1–4.2 (Supp.1977)).

*Bruce Church, Inc.* [397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174]

*Id.* at 624, 98 S.Ct. at 2535 (citations omitted). The crucial inquiry, therefore, is whether the Holley Bill is basically a protectionist measure, or whether it is based on legitimate local concerns with effects on interstate commerce that are only incidental. *Id.* at 624, 98 S.Ct. at 2536.

The district court below concluded that the Holley Bill was directed toward a legitimate state concern: complying with SARA's capacity assurance requirements. The district court said that the Holley Bill was "not an effort to isolate Alabama from the national economy." *National Solid Wastes Management Ass'n v. Alabama Dep't of Envtl. Management,* 729 F.Supp. 792, 804 (N.D.Ala.1990). We disagree. First, the Holley Bill is not required for Alabama to comply with section 104(c)(9)'s capacity assurance requirement. According to the Senate Report on SARA and the EPA Guidance Document, Alabama may satisfy its capacity assurance requirements by any combination of three measures: (1) creating new disposal capacity within the state, (2) entering into interstate or regional agreements allowing Alabama to use capacity located in other states, and (3) contracting with private waste management facilities. S.Rep. No. 11, 99th Cong., 1st Sess. 22 (1985); EPA Guidance Doc. at 3. If Alabama's capacity assurance plan depends on capacity provided by a commercial, privately owned management facility such as Emelle, the state should contract with the private facility for that capacity, instead of blocking the private facility from accepting wastes from other states.

Second, while the Alabama legislature made a finding that large volumes of hazardous waste entering the state increased the likelihood of accidents and the risk to Alabama's citizens and environment, *see* Ala.Act. No. 89–788, Alabama did not ban the shipment of all hazardous wastes into the state, but only shipments from certain states. "[T]he evil of protectionism can reside in legislative means as well as legislative ends." *City of Philadelphia,* 437 U.S. at 626, 98 S.Ct. at 2536–37. Even if Alabama's purpose in enacting the Holley Bill was to protect human health and the environment in Alabama, that purpose "may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently." *Id.* at 626–27, 98 S.Ct. at 2537. Plaintiffs presented testimony undisputed by defendants that the types of wastes accepted at the Emelle facility did not vary based upon the states in which the wastes were generated. The Holley Bill plainly distinguishes among wastes based on their origin, with no other basis for the distinction.

Because Alabama's law is a protectionist measure not based adequately on a legitimate local concern, the district court was wrong to apply the *Pike v. Bruce Church, Inc.* balancing test. The Holley Bill does not regulate "evenhandedly" and its effects on interstate commerce are not merely incidental. *See Pike,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). On its face, the Holley Bill discriminates among out-of-state waste generators and imposes on these generators the burden of conserving Alabama's remaining hazardous waste disposal capacity. We reject the district court's conclusion that, because Alabama closed its borders to only some states and not all states, Alabama is not hoarding its disposal capacity. Alabama has attempted to "isolate itself from a problem common to many by erecting a barrier against the movement of interstate trade." *City of Philadelphia,* 437 U.S. at 628, 98 S.Ct. at 2538.

Contrary to defendants' arguments, the Holley Bill does not fall within an exception to the commerce clause carved out by the so-called "quarantine cases." In these cases, the Supreme Court upheld state legislation that facially discriminated against out-of-state commerce involving articles that were highly dangerous. For example, the Court upheld a Maine statute that prohibited the importation of a certain type of baitfish not native to Maine because the baitfish contained a parasite that could have a serious detrimental effect on Maine's fisheries. *Maine v. Taylor,* 477

U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986). Such state laws do not discriminate against interstate commerce, however, but "simply prevent[ ] traffic in noxious articles, whatever their origin." *City of Philadelphia*, 437 U.S. at 629, 98 S.Ct. at 2538.

Alabama's selective ban on out-of-state hazardous waste is no quarantine law. Alabama did not ban hazardous wastes from all other states on the ground that the wastes were dangerous to some human health or environmental aspect which Alabama has a right to regulate. Alabama's ban does not distinguish on the basis of type of waste or degree of dangerousness, but on the basis of the state of generation. The Holley Bill discriminates against interstate commerce.

### 3. *Congressional Authorization*

█ A state statute that erects a barrier to interstate commerce may nonetheless be upheld where Congress authorizes the state to regulate in such a manner. "Where state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce." *White v. Massachusetts Council of Constr. Employers, Inc.*, 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983). "Congress may redefine the distribution of power over interstate commerce by permitting the states to regulate the commerce in a manner which would otherwise not be permissible." *South–Central Timber Devel., Inc. v. Wunnicke*, 467 U.S. 82, 87–88, 104 S.Ct. 2237, 2240, 81 L.Ed.2d 71 (1984). Such congressional intent or authorization for states to affect interstate commerce, however, must be "expressly stated" and "unmistakably clear." *Id.* at 91, 104 S.Ct. at 2242; *see also White*, 460 U.S. at 212–13,

103 S.Ct. at 1046–47 (city's requirement that certain percentage of work on public construction projects be done by local labor did not violate commerce clause because federal urban development programs "affirmatively sanctioned" improved opportunities for the poor, minorities, and unemployed). So, our task at this point is to determine whether Congress has authorized Alabama to erect its barrier to the interstate movement of hazardous wastes.

Defendants contend that SARA's section 104(c)(9) effected a redistribution of power over interstate commerce. According to defendants, the SARA amendments to CERCLA gave the states more responsibility for hazardous waste management, including an obligation to develop increased treatment and disposal capacity. But nothing in SARA evidences congressional authorization for each state to close its borders to wastes generated in other states to force those other states to meet federally mandated hazardous waste management requirements.[10] SARA places the burden of making capacity assurances for future hazardous waste management on the *generating state* and imposes a sanction on that state for failure to satisfy its obligation.[11] Congress has not, in our opinion, authorized Alabama to restrict the free movement of hazardous wastes across Alabama's borders. *See State of Alabama v. United States EPA*, 871 F.2d at 1555 n. 3 ("Although Congress may override the commerce clause by express statutory language, it has not done so in enacting CERCLA." (citing *Wunnicke*, 467 U.S. at 82, 104 S.Ct. at 2237)). If Congress intended to allow the states to restrict the interstate movement of hazardous wastes as

---

**10.** Defendants point out that, after the enactment of the Holley Bill, North Carolina took steps toward the creation of additional hazardous waste disposal facilities within its borders. *See* Ch. 168, 1989 North Carolina Session Laws. Even if, as defendants claim, this action was motivated in part by the Holley Bill, we reject defendants' argument that this activity legitimates Alabama's attempts to enforce the federal capacity assurance requirements set out in section 109(c). *See Wisconsin Dep't of Indus. v. Gould, Inc.*, 475 U.S. 282, 286, 106 S.Ct. 1057,

1061, 89 L.Ed.2d 223 (1986) (states may not impose penalties on conduct already penalized under federal statutory scheme).

**11.** The sanction, withholding of funds for remedial cleanups of Superfund sites on the National Priorities List, seems effective because, in March 1989, almost every state had at least one site on this list. *See* 40 C.F.R. Part 300, App. B (1989).

Alabama has tried to do, Congress could (and still can) plainly say so.[12]

## II. THE CHALLENGED REGULATIONS

### A. BACKGROUND

While CERCLA is designed to cleanup unsafe hazardous waste sites, the federal Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6901–6992k (1982 & Supp. V 1987), provides a "cradle-to-grave" regulatory program. RCRA sets minimum standards for the generation, treatment, storage, and disposal of hazardous wastes in the nation. Faced with a "growing body of evidence that *land* disposal of hazardous wastes ... in many cases poses grave threats to public health and the environment," H.R.Rep. No. 98–198, Part 1, 98th Cong., 2d Sess. 20, *reprinted in* 1984 U.S.Code Cong. Admin. News 5576, 5578 (emphasis added), Congress amended RCRA in 1984, prohibiting the disposal of certain highly toxic and mobile hazardous wastes in landfills unless those wastes are first treated to reduce toxicity and mobility using the best available demonstrated technology. *See* 42 U.S.C. § 6924(d)–(m). Because of a nationwide shortage of other types of disposal capacity and the time involved to implement advanced pretreatment programs, EPA exempted from this "land disposal ban" certain waste soil and debris generated in cleanups conducted under CERCLA and in corrective actions taken under RCRA until November 8, 1990. *See* 42 U.S.C. § 6924(h); 40 C.F.R. § 268; Land Disposal Restrictions for First Third Scheduled Wastes, 53 Fed.Reg. 31,137, at 31,143 (Aug. 17, 1988). In the language of EPA, the agency granted "variances" from the effective date of the land disposal ban for these certain wastes.

Corresponding to Congress's amendment of RCRA imposing the land disposal ban, Alabama amended its hazardous waste program by adopting the challenged land disposal restriction ("LDR") regulations, Ala. Admin.Code r. 14–9–.03. The LDR regulations are almost identical to the federal land disposal ban, except that Alabama did not adopt EPA's variances from the effective date of the ban for certain CERCLA and RCRA wastes. Alabama's prohibition of the land disposal of untreated wastes became effective August 24, 1989.

For the expressed purpose of facilitating enforcement of the LDR regulations, Alabama adopted the challenged pre-approval regulations, Ala.Admin.Code r. 14–3–.08.[13] These regulations prohibit a commercial hazardous waste management facility in Alabama from accepting wastes without specific pre-approval from the state. The regulations require that the generator of hazardous waste which is des-

---

**12.** For example, under the Low–Level Radioactive Waste Policy Act, 42 U.S.C. §§ 2021b–2021j (1982 & Supp. V 1987), states are encouraged to enter into regional compacts to provide for the establishment and operation of regional disposal facilities for low-level radioactive waste. 42 U.S.C. § 2021d. In this Act, which predates SARA, Congress expressly authorized states that enter into such compacts to ban waste shipments from states that neither enter into a compact nor meet federal deadlines for establishing their own facilities. 42 U.S.C. § 2021e(e)(2), (f)(1).

**13.** Alabama's stated rationale for adopting the pre-approval regulations was to "verify that all waste is properly classified and waste that is subject to the land ban requirements is properly identified and has or will receive proper pretreatment." Rationale for Adoption of Emergency Hazardous Waste Regulations, Alabama Dep't of Envtl. Management. R–I–17–Exh. D. Alabama determined that it could not adequately enforce the LDR regulations without a pre-approval process. *See* Transcript of Public Meeting of the Envtl. Management Comm'n on Proposal for Adoption of Emergency Amendments to Hazardous Waste Regulations, Aug. 16, 1989. R–I–17–Exh. E.

The pre-approval regulations were originally adopted as emergency regulations under authority of Ala.Code §§ 22–22A–5 to –8, 22–30–11, & 41–22–5(b) (1984 & Supp.1989); essentially identical permanent regulations have since been approved. Defendants contend that plaintiffs' challenge to the emergency pre-approval regulations is therefore moot. We reject this contention based on the Supreme Court's ruling that, when temporary regulations are superseded by substantially identical permanent regulations, the case is not moot so long as both sets of regulations present the same constitutional questions. *Panama Refining Co. v. Ryan,* 293 U.S. 388, 413–14, 55 S.Ct. 241, 245, 79 L.Ed. 446 (1935).

tined for disposal at a commercial facility in Alabama must apply for approval at least sixty days in advance of the shipment. The generator does not need approval for each shipment, but must have approval for each waste stream, defined as "a waste of given characteristics that is unique to a particular process or individual generation site." Ala.Admin.Code r. 14–3–.08(5). Approval is valid for up to one year and can be renewed.

The pre-approval requirement allows Alabama to identify the wastes being disposed and to determine whether the wastes must be pretreated in accordance with the LDR regulations. The pre-approval regulations apply equally to wastes generated in Alabama and out of state, but no limitation is expressed on how long Alabama can wait before issuing its approval decision.

As a result of the LDR regulations, plaintiff ChemWaste claims that it has been forced to refuse shipments of waste from at least seven CERCLA or RCRA sites that are undergoing cleanups, even though it would have been able to accept those wastes at Emelle under the federal regulations. ChemWaste says that it has been forced to refuse new requests for waste disposal, as well as to refuse to fulfill its obligations under preexisting waste disposal contracts.

 The district court below, without expressly discussing the challenged regulations, concluded that the regulations were constitutional. The district court's Memorandum Opinion addressed only the Holley Bill, but the court's Final Order said that all three challenged actions were constitutional. On appeal, Alabama made it clear that the challenged regulations are separate from and were not enacted to implement the Holley Bill.[14] After conducting a separate consideration of plaintiffs' claims

regarding the regulations, we disagree with the district court. To the extent that the LDR regulations fail to allow the same variances as those granted by EPA, the regulations are preempted and thus violate the supremacy clause. The independent effect of the pre-approval regulations, which require all waste generators to obtain the state's pre-approval before disposing of wastes at commercial facilities in Alabama, places an impermissible burden on interstate commerce. These pre-approval regulations are, therefore, also unconstitutional.[15]

## B. LDR REGULATIONS

 "[W]hen a state's exercise of its police power is challenged under the Supremacy Clause, 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 157, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978). No such congressional purpose exists to preempt the entire field of interstate waste management, "either by express statutory command, or by implicit legislative design." *City of Philadelphia*, 437 U.S. at 621 n. 4, 98 S.Ct. at 2534 n. 4 (citations omitted). RCRA expressly says that "[n]othing in this chapter shall be construed to prohibit any State ... from imposing any requirements ... which are more stringent than [RCRA]." 42 U.S.C. § 6929. This language prevents a conclusion that Congress preempted all state regulation of hazardous waste management. *See ENSCO, Inc. v. Dumas*, 807 F.2d 743, 744–45 (8th Cir. 1986); *see also* 42 U.S.C. § 6902(a)(7) (objectives of RCRA—protecting health and environment and conserving valuable mate-

---

**14.** The pre-approval regulations may implement the Holley Bill to the extent that the regulations allow Alabama to identify the origin of hazardous wastes. But because this effect seems incidental and because the stated purpose of the pre-approval regulations is to facilitate enforcement of the LDR regulations, we decline to strike the pre-approval regulations on the basis that the Holley Bill is unconstitutional.

**15.** Defendants contend that plaintiffs cannot properly challenge Alabama's regulations in this court because plaintiffs have not exhausted their administrative remedies. But there is no general requirement of exhausting administrative remedies before bringing a federal suit to invalidate state actions as unconstitutional. *See Alleghany Corp. v. Haase*, 896 F.2d 1046, 1050 (7th Cir.1990).

rial and energy resources—are accomplished in part by establishing a viable federal-state partnership); H.R.Rep. No. 1491, 94th Cong., 2d Sess. 33, *reprinted in* U.S. Code Cong. & Admin.News 6238, 6271 (1976) ("federal preemption of this problem is undesirable, inefficient, and damaging to local initiative").

But in the 1984 amendments to RCRA, Congress did preempt Alabama's specific action of implementing a state land disposal ban that omits the variances ordered by EPA. In the RCRA amendments, Congress granted the EPA Administrator authority to establish an effective date for the land disposal ban different from the effective date which would have otherwise applied under the RCRA amendments. 42 U.S.C. § 6924(h)(2). Congress wrote that such alternative effective date must "be established on the basis of the earliest date on which adequate alternative treatment, recovery, or disposal capacity which protects human health and the environment will be available." *Id.*

Congress granted EPA alone the power to grant variances from the effective date for certain types of wastes because the lawmakers intended for the assessment of available pretreatment capacity to be made on a nationwide basis: "The available capacity determination is to be done on a national basis. Otherwise, different regions of the country would be receiving varying degrees of protection and could be used as a dumping grounds for the rest of the country." S.Rep. No. 284, 98th Cong., 1st Sess. 19 (1983). When promulgating its regulations concerning the variances, EPA clearly stated the respective roles of EPA and the states: "The Administrator of EPA is solely responsible for granting variances to the effective dates [of the land disposal ban] because capacity determinations must be made on a nationwide basis." 53 Fed. Reg. 31,137, at 31,203 (Aug. 17, 1988). Alabama's LDR regulations attempt to "regionalize" pretreatment requirements, action which Congress expressly disapproved. *See* S.Rep. 284, 98th Cong., 1st Sess. 19 (1983). These regulations may not be lawfully enforced.

## C. PRE–APPROVAL REGULATIONS

The pre-approval regulations supplement the LDR regulations: the pre-approval regulations require waste generators to obtain Alabama's approval before disposing of wastes at commercial facilities in Alabama. These regulations place an impermissible burden on interstate commerce.

We begin by recognizing that the pre-approval regulations apply equally to in-state and out-of-state waste generators. The regulations state that "[e]ffective November 30, 1989, all generators ... must have approval for disposal by the Department, prior to disposal of any given waste stream." Ala.Admin.Code r. 14–3–.08(3). Plaintiffs, who have the burden of proving that Alabama's actions discriminate against interstate commerce, *see Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979), make no allegation that Alabama has somehow favored in-state waste generators by the state's application of these regulations, for example, by delaying or denying altogether requests from out-of-state generators.

■ Where the challenged state action does not on its face discriminate against interstate trade, we apply a balancing test to determine if the challenged acts violate the commerce clause: "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142, 90 S.Ct. at 847. If we find a legitimate local purpose, "the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.*

The pre-approval regulations impose a significant burden on the business of hazardous waste disposal. Under RCRA, generators must dispose of hazardous wastes within ninety days of generation or obtain a RCRA permit for hazardous waste storage. *See* 40 C.F.R. § 262.34 (1989). Be-

cause the pre-approval regulations set no limit on how long Alabama can delay in responding to a request for approval, the pre-approval process can cause waste generators who wish to dispose of wastes in Alabama to expend time and money not only in complying with Alabama's special requirements, but also in complying with federal regulations that might not ordinarily come into play. In addition, Alabama can delay so long in granting a decision on approval that the regulations can be used to bar waste disposal completely in Alabama, forcing waste generators to take their waste elsewhere or to stop producing waste. The risk of long delay in approval is increased by the fact that the pre-approval regulations nowhere define the criteria by which Alabama will approve or disapprove a waste generator's request.

Because the regulations impose substantial economic burdens on both intrastate and interstate commerce, the local benefits must be great for these regulations to be valid. Alabama's only formally stated reason for adoption of the regulations—and the only reason argued to this court—was to facilitate enforcement of the LDR regulations, which are themselves unenforceable. We must conclude that the pre-approval regulations are too burdensome when compared to the local benefit and, therefore, invalidate the regulations as contrary to the Constitution.

## III. CONCLUSION

Minimizing the dangers to public health and the environment created by uncontrolled and untreated hazardous wastes is an important task facing society. But Alabama's statute banning wastes selectively, based on state of origin, and the state's substantially burdensome pre-approval regulations cannot stand in the face of the Constitution's commerce clause. However honorable and well intentioned Alabama's leaders might be in coming to grips with environmental problems, "it is the duty of the courts to guard vigilantly against any needless intrusion" on "the protection afforded [interstate commerce] by the federal Constitution." *Bowman,* 125 U.S. at 492,

489 S.Ct. at 702. In addition, Alabama's regulation of hazardous waste land disposal is preempted by "the clear and manifest purpose of Congress" that EPA have the power to grant variances from the effectiveness of the land disposal ban on a nationwide basis. In such a case, "[u]nder the Constitution ... the state law must yield to the federal." *Jones v. Rath Packing Co.,* 430 U.S. 519, 543, 97 S.Ct. 1305, 1318, 51 L.Ed.2d 604 (1977). The Constitution, here specifically the commerce and supremacy clauses, may not be encroached upon, even in an attempt to do something good for the environment.

We VACATE summary judgment for defendants, REMAND to the district court, and—because no material issues of fact remain—instruct the district court to enter summary judgment for plaintiffs.