**HAZARDOUS WASTE TREATMENT COUNCIL, on behalf of itself and its members, Plaintiff–Appellee,**

**v.**

**STATE OF SOUTH CAROLINA; Carroll A. Campbell, Jr., Governor of the State of South Carolina; Commissioner, South Carolina Department of Health and Environmental Control; South Carolina Department of Health and Environmental Control; South Carolina Board of Health and Environmental Control, Defendants–Appellants.**

**United States of America, Amicus Curiae.**

**No. 91–2317.**

United States Court of Appeals, Fourth Circuit.

Argued May 6, 1991.

Decided Sept. 20, 1991.

---

James Patrick Hudson, Deputy Atty. Gen., Columbia, S.C., and Charles F. Lettow, Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., argued (T. Travis Medlock, Atty. Gen. of S.C., Edwin E. Evans, Chief Deputy Atty. Gen., Kenneth P. Woodington, Sr. Asst. Atty. Gen., Columbia, S.C., Matthew D. Slater, Washington, D.C., Treva G. Ashworth, Sr. Asst. Atty. Gen., Mark R. Elam, Sr. Legal Counsel, Office of the Governor, and Walton J. McLeod, III, Gen. Counsel, Jacquelyn S. Dickman, Asst. Gen. Counsel, Samuel L. Finklea, III, Staff Counsel, Columbia, S.C., on brief), for defendants-appellants.

Stuart Henry Newberger, Crowell & Moring, Washington, D.C., argued (Ridgeway M. Hall, Jr., Clifton S. Elgarten, Melissa J. McKenney, Amy J. Mauser, Washington, D.C., Jeter E. Rhodes, Jr., Whaley, McCutchen, Blanton & Rhodes, Columbia, S.C., David Case, Gen. Counsel, Hazardous Waste Treatment Council, Washington, D.C., on brief), for plaintiff-appellee.

Richard B. Stewart, Asst. Atty. Gen., Anne S. Almy, Nancy K. Stoner, U.S. Dept. of Justice, Washington, D.C., for amicus curiae.

Before MURNAGHAN and SPROUSE, Circuit Judges, and MURRAY, Senior District Judge for the District of Maryland, sitting by designation.

## OPINION

MURNAGHAN, Circuit Judge:

The case before us arises on appeal from a preliminary injunction granted to Hazardous Waste Treatment Council ("HWTC")[1] which enjoins South Carolina from enforcing, applying, or attempting to apply portions of two state executive orders, two state statutes, and one regulation, all relating to hazardous waste management, 766 F.Supp. 431. HWTC's contention, seeking declarative and injunctive relief, that the Commerce Clause renders parts of the executive orders and statutes unconstitutional, permitting it to operate free from the constraint of such parts, presents a grave and serious question and we therefore affirm the district court's grant of a preliminary injunction to such an extent. We remand, however, to permit the district court to modify its order to clarify that it neither enjoined aspects of the legislation not implicated by the Commerce Clause argument nor, on the merits, declared the enjoined legislation invalid by reason of the Commerce Clause. In addition, we remand the preliminary injunction inquiry relating to the challenged state regulation to allow the district court to balance the hardships to the parties.

### I.

An amalgam of federal acts, federal regulations, state statutes, state regulations, and court opinions, all addressing the hazardous waste problem, comprise the background of the instant appeal. At the preliminary injunction stage, where the merits have not yet been addressed, we need only sketch the broad outlines that enable us to reach a decision. We first touch upon the federal programs that comprise the background to the appeal. We then explain the South Carolina legislation challenged in the appeal. As our colleagues on the Eleventh

1. HWTC is a national association of licensed commercial firms which treat, recycle, and dispose of hazardous waste. Three HWTC members are located within South Carolina.

Circuit recently wrote, "our job is not to make policy, but to interpret the federal legislation and regulations to determine Congress's intent.... We recognize that serious problems associated with hazardous waste management plague our nation; but whatever our own views may be about the effectiveness of what Congress or Alabama has done, we can only apply the law." *Nat'l Solid Wastes Management Ass'n v. Alabama Dep't of Envtl. Management,* 910 F.2d 713, 715–16 (11th Cir.1990), *as modified upon denial of reh'g,* 924 F.2d 1001 (11th Cir.1991), *cert. denied,* — U.S. ——, 111 S.Ct. 2800, 115 L.Ed.2d 973 (1991).

## A. *Federal Laws and Regulations*

Fifteen years ago, Congress passed the Resource Conservation and Recovery Act of 1976 ("RCRA"), as amended, 42 U.S.C. §§ 6901–92k. RCRA establishes a national program for hazardous waste management administered by the Environmental Protection Agency ("EPA"). RCRA encompasses most aspects of hazardous waste management, including identification of waste, standards for generators, transporters, and operators of treatment, storage, and disposal facilities, and procedures for permits. Section 3006(b) of RCRA allows a state to implement its own program "in lieu of the federal program." 42 U.S.C. § 6926(b). No aspect of RCRA is to be "construed to prohibit any State ... from imposing any requirements, including those for site selection, which are more stringent than' those imposed by such regulations." 42 U.S.C. § 6929. A state's program, however, must be "equivalent to" and "consistent with" the federal program and must provide "adequate enforcement of compliance." 42 U.S.C. § 6926(b). Such a state program, authorized by EPA, "shall have the same force and effect" as action taken by EPA. 42 U.S.C. § 6926(d).

RCRA has been explained and implemented by numerous federal regulations. Of particular concern in the present case, is 40 C.F.R. § 271.4, which implements RCRA § 3006, 42 U.S.C. § 6926:

## § 271.4 Consistency

To obtain approval, a State program must be consistent with the Federal program and State programs applicable in other States and in particular must comply with the provisions below. For purposes of this section the phrase "State programs applicable in other States" refers only to those State hazardous waste programs which have received final authorization under this part.

(a) Any aspect of the State program which unreasonably restricts, impedes, or operates as a ban on the free movement across the State border of hazardous wastes from or to other States for treatment, storage, or disposal at facilities authorized to operate under the Federal or an approved State program shall be deemed inconsistent.

(b) Any aspect of State law or of the State program which has no basis in human health or environmental protection and which acts as a prohibition on the treatment, storage or disposal of hazardous waste in the State may be deemed inconsistent.

(c) If the State manifest system does not meet the requirements of this part, the State program shall be deemed inconsistent.

40 C.F.R. § 271.4.

RCRA attempts to address hazardous waste before it becomes a problem. Congress enacted other federal statutes to deal with the need to cleanup improperly or illegally disposed waste. In 1980, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S. §§ 9601–75, created a fund—*i.e.,* a "Superfund"—of federal money available for state cleanup efforts. Several years later, when it became apparent that local community actions were resulting in little construction or expansion of hazardous waste management facilities, Congress enacted amendments to CERCLA § 104(c), the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L. No. 99–499, 100 Stat. 1613. Of particular importance to the instant appeal, amendment § 104(k) which became CERCLA § 104(c)(9) provided:

## (9) Siting

Effective 3 years after October 17, 1986, the President shall not provide any remedial actions pursuant to this section unless the State in which the release occurs first enters into a contract or cooperative agreement with the President providing assurances deemed adequate by the President that the State will assure the availability of hazardous waste treatment or disposal facilities which—

(A) have adequate capacity for the destruction, treatment, or secure disposition of all hazardous wastes that are reasonably expected to be generated within the State during the 20–year period following the date of such contract or cooperative agreement and to be disposed of, treated, or destroyed,

(B) are within the State or outside the State in accordance with an interstate agreement or regional agreement or authority,

(C) are acceptable to the President, and

(D) are in compliance with the requirements of subtitle C of the Solid Waste Disposal Act [42 U.S.C.A. § 6921 et seq.]

42 U.S.C. § 9604(c)(9). Section 104(c)(9) has been construed to require each state to present a Capacity Assurance Plan ("CAP") to EPA.

EPA's Office of Solid Waste and Emergency Response ("OSWER") issued two directives explaining the CAPs. *See* OSWER Directive 9010.00a (Oct. 16, 1989) ("Agency Review of SARA Capacity Assurance Plans"); OSWER Directive 9010.00 (December 1988) ("Assurance of Hazardous Waste Capacity: Guidance to State Officials"). The directives emphasize that waste reduction is the preferred method of addressing hazardous waste problems. *See* OSWER Directive 9010.00a, at 1–2. However, the directives also explain that SARA was enacted to solve the "NIM-BY"—"not in my backyard"—problems that arose because of political pressure and public opposition:

Congress believed that some states were not moving aggressively to create facilities needed to manage hazardous wastes and that this inaction could lead to the creation of additional Superfund sites, even though some wastes might be managed at facilities available in other states. This problem would be exacerbated if the costs of interstate waste management were to rise or if states were to take actions that directly or indirectly impeded interstate waste movement. Although any hazardous waste management facilities created would be regulated in an environmentally safe manner under RCRA, existing statutory and regulatory authorities did not adequately address the need to develop and to assure access to such facilities within and among the states.

OSWER Directive 9010.00, at 2; *see Nat'l Solid Wastes*, 910 F.2d at 717. Thus, CERCLA § 104(c)(9) envisions the import and export of hazardous waste to avoid future Superfund cleanup sites along with the construction of new facilities.

As the directives note, "Planning for twenty years of waste generation is not a simple task, particularly when the states will not, in most cases, own the wastes or directly control their generation or disposition." OSWER Directive 9010.00, at 6. Consequently, CERCLA § 104(c)(9) conditions the receipt of Superfund remedial funds on a state's presentation of a CAP which "assures" twenty-year capacity for in-state generated waste either at in-state facilities or at out-of-state facilities pursuant to an interstate or regional agreement. At least on the materials available to us at the preliminary injunction stage, CERCLA § 104(c)(9) does not appear to contemplate that hazardous waste actually be disposed of according to the CAP. For example, the OSWER directives imply that, for the purposes of the CAP, a state's in-state capacity will be reduced by imported hazardous waste only to the extent that an interstate or regional agreement exists. Hence, it appears that even if fifty percent of South Carolina facilities' capacity actually is used to treat out-of-state waste, unless that percentage occurred pursuant to an interstate

or regional agreement, South Carolina can obtain EPA approval for a CAP that allocates the very same capacity to in-state generated waste. The CAP is intended to ensure that, *in theory,* no future cleanup will be required because sufficient sites will exist somewhere to treat and dispose of the waste.

Moreover, CERCLA § 104(c)(9) does not appear to fine a noncompliant state, does not prohibit private parties from importing or exporting hazardous waste in the absence of an interstate or regional agreement, does not establish equal distribution requirements for hazardous waste facilities among the states, and does not introduce percentage limits on in-state and out-of-state waste. The only penalty faced by a state that refuses to comply with CERCLA § 104(c)(9) is disqualification for Superfund money.

### B. *South Carolina's Legislation*

In 1985, EPA gave South Carolina RCRA authorization to operate its program.[2] In 1989, South Carolina began to execute the two state statutes, two executive orders, and one state regulation that are the subject of the instant appeal.

1) Act No. 196 of 1989, enacted June 14, 1989, requires that South Carolina hazardous waste treatment and disposal facilities give preference to in-state generators,[3] and prohibits "any person who owns or oper-

ates a waste treatment facility within this State" from accepting

any hazardous waste generated in any jurisdiction which prohibits by law the treatment of that hazardous waste within that jurisdiction or which has not entered into an interstate or regional agreement for the safe treatment of hazardous waste pursuant to the federal Comprehensive Environmental Response, Compensation and Liability Act.

S.C.Code Ann. § 44–56–130(4); Act. No. 196 § 9.

Executive Order 89–17 is basically an earlier version of Act No. 196. It provides a mandatory preference for in-state generators and prohibits the acceptance of hazardous waste from out-of-state generators where such disposal is banned.[4]

2) Act No. 590 requires that a permit be obtained before operating a hazardous waste facility. The act limits the amount of hazardous waste that may be disposed of by burial.[5] More waste may be buried upon certification, provided that disposal "is necessary to protect the health and safety of the people of this State" or "at least one hundred ten thousand tons of hazardous waste disposed of by land burial in this State during the twelve-month period was generated in South Carolina." S.C.Code Ann. § 44–56–60(a)(3). In addition, during each period,

---

**2.** At that time EPA approved the program despite an argument that the program was "inconsistent." South Carolina's program contained a fee schedule that placed a higher fee for disposal of waste generated outside the state than for that domestically generated. EPA concluded that the statute did not render the program "inconsistent" under RCRA. 50 Fed.Reg. 46437 (1985). EPA explained that it "intended 'unreasonable restrictions or impediments' to render State programs inconsistent," 50 Fed.Reg. 46438 (1985), and the fee differential was not unreasonable. As far as we know, the South Carolina fee differential has not been challenged under the Commerce Clause and is not challenged in this case. *Cf. Nat'l Solid Waste Management Ass'n v. Voinovich,* 763 F.Supp. 244 (S.D.Ohio 1991) (finding unconstitutional a state statute levying higher taxes on out-of-state solid wastes).

**3.** "All hazardous waste treatment and disposal facilities in South Carolina shall give preference

to hazardous waste generators within the State of South Carolina for treatment and disposal of hazardous materials at licensed facilities in the State." S.C.Code Ann. § 44–56–205; Act No. 196 § 5.

**4.** Executive Order 89–17 extends and amends an earlier executive order, 89–03, promulgated on January 19, 1988:

No person who owns or operates a disposal facility in this State shall accept hazardous waste which is generated in another State and is banned or prohibited for disposal by any statute, regulation or administrative decision of the State.

**5.** From July 1, 1990 to July 1, 1991, hazardous waste disposal sites are restricted to one hundred twenty thousand tons of waste per twelve months. After July 1, 1991, the restriction drops to one hundred ten thousand tons.

a person operating a hazardous waste disposal facility or site shall reserve at least the same capacity to dispose of hazardous waste generated in South Carolina that was disposed of by burial at that facility or site during the previous year.... No more hazardous waste from out of state shall be buried in South Carolina than was buried in the previous twelve-month period.

*Id.*

3) Executive Order 89–25, promulgated on July 6, 1989, requires in-state disposal facilities to reserve "54,000 tons per year of the statutory maximum of 135,000 tons per year for South Carolina generated waste" and to limit the waste from any one state to 35,000 tons, at the rate of 10,000 tons per quarter.

4) South Carolina Department of Health and Environmental Control ("DHEC") Regulation 61–99, effective January 12, 1990, requires "applicants for permits to establish or expand facilities for treatment, storage, or disposal of hazardous waste," Reg. 61–99(I)(B), to demonstrate "need." "Need" cannot include hazardous waste generated outside of South Carolina. Reg. 61–99(III)(C).

In response to an EPA request on July 6, 1989, South Carolina provided a South Carolina Attorney General Opinion that Executive Order 89–17 and Act No. 196 were "consistent" under 40 C.F.R. § 271.4(a). In reaching that decision, the Attorney General concluded that, because the statute appeared constitutional under Commerce Clause analysis, it was "consistent." The Attorney General, however, noted that the

portion of Act No. 196 challenged here on appeal raised a "more difficult legal question" under Supreme Court jurisprudence. No response by EPA appears in the record.

Copies of some of the legislation, including Act No. 196 and the two executive orders, were also submitted to EPA on October 17, 1989 as part of South Carolina's effort to gain approval of its CAP under CERCLA § 104(c)(9). South Carolina also included a copy of a SARA Capacity Assurance Regional Agreement with Tennessee, Kentucky, and Alabama.[6] With little comment, on May 10, 1990, EPA approved the CAP.

On June 28, 1990, HWTC filed suit against the State of South Carolina, its governor, and certain state agencies, for declaratory and preliminary and permanent injunctive relief. HWTC alleged that the statutes, orders, and regulations violated the Commerce Clause, the Privileges and Immunities Clause, the Supremacy Clause, and 42 U.S.C. § 1983. In addition, HWTC filed a motion for preliminary injunction. South Carolina moved for partial dismissal of all but the Commerce Clause claims and argued abstention as a basis for dismissal of the Commerce Clause claims with respect to Regulation 61-99.[7]

On September 27, 1990, the district court heard the motions for preliminary injunction and partial dismissal based on affidavits and documentary materials. On December 18, 1990, the district court issued a temporary restraining order to stop South Carolina from prohibiting hazardous waste from North Carolina.[8]

**6.** North Carolina joined the Agreement; however, that state's participation depended on the construction or permitting of certain new facilities.

**7.** Sierra Club, Energy Research Foundation, Citizens for Clear Air and Water, Environmentalists, Inc., and Citizens Asking for a Safe Environment, Inc. (collectively "Sierra Club") filed a motion to intervene as party defendants with respect to the argument over Regulation 61–99. The district court denied the motion on January 15, 1991. Sierra Club's appeal to this court is No. 91–2331.

**8.** The proceedings giving rise to the temporary restraining order illustrate the complexities of

South Carolina's and HWTC's positions. North Carolina had been a party to the regional agreement provided it created additional hazardous waste facilities, including undertaking the permitting for an incinerator by December 31, 1990. In mid-December 1990, North Carolina's Council of State apparently rejected the transfer of certain state lands for this purpose. South Carolina's governor promptly sent a letter advising the governor of North Carolina that North Carolina would be automatically eliminated from the regional agreement. Under the legislation at issue in this appeal, South Carolina facilities would be prohibited from accepting hazardous waste from North Carolina.

On January 11, 1991, the district court issued a preliminary injunction against South Carolina and denied South Carolina's motion for partial dismissal.

## II.

In this circuit, the criteria to be examined when confronting a motion for a preliminary injunction and the appellate review of a district court's grant of a preliminary injunction are well settled. A grant of preliminary injunction is " 'discretionary with the district court and may not be set aside on appeal unless an abuse of discretion is shown.' " *Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353, 358 (4th Cir.1991) (citation omitted). The *Blackwelder* standard governs the imposition of a preliminary injunction. *See Blackwelder Furniture Co. v. Seilig Mfg. Co., Inc.,* 550 F.2d 189 (4th Cir.1977). Remembering that minimization of change in the *status quo* and not decision on the merits of the controversy is the objective, a court considers four factors:

(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied,

(2) the likelihood of harm to the defendant if the requested relief is granted,

(3) the likelihood that the plaintiff will succeed on the merits, and

(4) the public interest.

*L.J. By and Through Darr v. Massinga,* 838 F.2d 118, 120 (4th Cir.1988), *cert. denied,* 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 805 (1989). If the balance of the first two factors " 'tips decidedly' in favor of the plaintiff," *Rum Creek Coal,* 926 F.2d at 359 (citation omitted), and " 'the

plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation,' " *id. (quoting Blackwelder,* 550 F.2d at 195), the court shall grant a preliminary injunction.

■ Some confusion appears as to the scope of the preliminary injunction granted in the instant case. South Carolina claims that the district court's preliminary injunction covered provisions not even arguably unconstitutional under the Commerce Clause. In addition, the state contends that the district court erroneously declared the legislation "invalid." With respect to the latter contention, the district court's memorandum opinion makes clear that it did not intend to declare "invalid" the challenged legislation. The use of the word "invalid" appears to have been a technical mistake and the district court should modify the order by striking the words "which this Court declares are invalid." Order (Jan. 11, 1991), at 2.

■ We agree with South Carolina that the district court should limit the preliminary injunction to those aspects of the challenged legislation that present Commerce Clause questions. Once again, we believe that the district court's intent was to enjoin only those aspects specifically addressed in the court's memorandum opinion. Specifically, the preliminary injunction properly extends to provisions relating to preference for in-state waste, prohibitions, limits, or other restrictions on the acceptance of certain out-of-state waste, and permitting restrictions referring to out-of-state waste or limiting need to in-state waste.[9]

---

Both South Carolina and HWTC allegedly have petitioned the EPA to withdraw North Carolina's RCRA authority and eligibility for Superfund money. HWTC apparently petitioned the EPA for withdrawal because of a North Carolina statute, S.B. 114, which was alleged to preclude construction of certain hazardous waste facilities. The EPA, however, denied the request. The District of Columbia Court of Appeals is currently considering HWTC's appeal from the EPA's denial (No. 90–1443).

**9.** The pertinent provisions appear to be (1) Act No. 196, §§ 5 and 9, amending S.C.Code Ann. §§ 44–56–205 and 44–56–130; (2) similar provi-

sions in Executive Order 89–17: *i.e.,* any related aspects of the preamble; page 4, fifth full paragraph, first sentence, beginning "no person ..." to page 5, fourth full paragraph, first sentence, "... State."; (3) Executive Order 89–25, any related aspects of the preamble; page 3, seventh paragraph, first sentence, beginning, "hazardous ... tons."; page 4, first full paragraph; (4) Act No. 590, § 1, in specific, § 44–56–59(A), (B)(2), § 2, in specific, § 44–56–60(a)(3)(B), with the exception of the final paragraph, "Certification ... site."

The district court should modify accordingly the preliminary injunction, thus limiting it. We

■ On appeal, the parties have focused their energy on the district court's conclusion that HWTC would likely succeed on the merits. However, we first must address the balance of the hardships prong of *Blackwelder*. The district court found that HWTC's members, inside and outside of South Carolina, would be injured by the challenged aspects of the legislation. Not only would the members within the state lose revenue from out-of-state sources but they would be required to chose among out-of-state sources. Similarly, out-of-state members would be required to find, "if possible," other treatment and disposal facilities. We agree with the district court's analysis assessing the likelihood of harm so far as it relates to the statutes and executive orders. They alter the ability of HWTC's members to import or export hazardous waste at existing facilities. The harm to South Carolina is less substantial because, as the district court noted, "[h]azardous wastes generated out of state pose no more threat to human health and the environment than hazardous waste generated in South Carolina."

■ More troubling, however, is the district court's analysis of Regulation 61–99. Only one sentence was devoted to harm caused by Regulation 61–99: "[t]he in state need requirement contained in the permit regulation also has injured the business interests of plaintiff's South Carolina members." "The rationale behind a grant of a

preliminary injunction has been explained as preserving the *status quo* so that a court can render a meaningful decision after a trial on the merits." *Rum Creek Coal*, 926 F.2d at 359. If Regulation 61–99 is not enjoined, the district court's analysis does not make clear whether or not HWTC will suffer irreparable harm. Even if Regulation 61–99 turns out to be unconstitutional, any particular member who seeks a permit during the pending litigation may be able to obtain it under the current requirements if, for example, in-state need exists. However, if Regulation 61–99 turns out to be constitutional, South Carolina may be stuck with an unnecessary facility that obtained a permit during the pendency of the litigation. On the other hand, if litigation were to take so long that the absence of a new facility to handle waste, including out-of-state waste, would create irreparable harm, not only to HWTC but to the public, because of the possible creation of additional untreated waste, then the balance might tip the other way on a reapplication for temporary injunctive relief. Thus, although as we note below, HWTC appears to have a substantial argument that Regulation 61–99 is unconstitutional, we cannot uphold the temporary injunction as it relates to Regulation 61–99 in the absence of evidence that the district court engaged in a specific test of the balance of the hardships. We remand to permit the district court to consider the hardships.[10]

do not believe that the parties are in disagreement on this issue. If disagreement arises over our *exclusion* of any particular provision, the district court should address it in a manner consistent with our opinion.

Because, as discussed below, we remand the preliminary injunction inquiry with respect to Regulation 61–99, we do not consider here the necessary scope of any possible eventual preliminary injunction of it.

10. South Carolina argues that the district court erred in refusing to abstain from ruling on Regulation 61–99. We affirm the district court's ruling. We note that because of our ruling in No. 91–2331 the district court should consider whether Sierra Club may intervene in the case, and we have considered Sierra Club's arguments on the issue either as an intervenor or *amicus curiae*. Abstention under *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), was not appli-

cable because the issue of whether parts of Regulation 61–99 violate the Commerce Clause will not be " 'mooted' " or " 'presented in a different posture by a state court determination of pertinent state law.' " *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) (citation omitted). Regulation 61–99(III)(C) prohibits involving out-of-state generation to show "need." The meaning of Regulation 61–99 is not "unsettled." *Virginia Hosp. Ass'n v. Baliles*, 868 F.2d 653, 664 (4th Cir.1989), *aff'd sub nom. Wilder v. Virginia Hosp. Ass'n*, — U.S. ——, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1900). And "questions of state law" will not dispose of the case. *Gordon v. Luksch*, 887 F.2d 496, 497 n. 2 (4th Cir.1989).

Similarly, abstention under *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), was not appropriate. Although Regulation 61–99 is part of a complex state regulatory

Nevertheless, because the balance of the first two factors appears to "tip decidedly" in favor of HWTC in the case of the statutes and executive orders, we reexamine HWTC's likelihood of success only to discover whether it has shown " 'grave or serious' questions for litigation." *Rum Creek Coal*, 926 F.2d at 363. As this Circuit has often repeated, " 'We of course venture no opinion as to facts that should be found, nor upon whether and how any facts that may be found will invoke the controlling doctrine.' " [11] *Id.* at 367 (citation omitted).

South Carolina, arguing for disposition in its favor, has asserted that RCRA and CERCLA § 104(c)(9) embody a congressional exercise of the commerce power rendering irrelevant dormant Commerce Clause analysis. The state claims that Congress specifically left states free to regulate hazardous waste subject to EPA oversight. Thus, South Carolina contends that EPA's regulation implementing RCRA § 3006 establishes the only standard applicable to the case: whether or not the statutes, orders, and regulation act otherwise as an unreasonable restriction, impediment, or ban on interstate movement of hazardous waste. South Carolina contends that its legislation is reasonable because CERCLA § 104(c)(9)(A) requires that the state provide assurance that it has capacity, either in-state or through regional or interstate agreements, to treat or dispose of all hazardous waste generated in the state for the next twenty years and it can only do so by reserving some capacity for in-state waste. However, that approach's application here is by no means crystal clear.

HWTC argues that the statutes, orders, and regulation violate the Commerce Clause. HWTC contends that Congress' enactment of legislation concerning hazardous waste did not authorize states to engage in actions that would, in the absence of such legislation, burden interstate commerce.

The Commerce Clause [12] "directly limits the power of the States to discriminate against interstate commerce." *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 273, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988). The negative or dormant Commerce Clause "prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.* at 273–74, 108 S.Ct. at 1807. Thus the Clause is a " 'substantive restriction on permissible state regulation' of interstate commerce." *Dennis v. Higgins*, —— U.S. ——, 111 S.Ct. 865, 870, 112 L.Ed.2d 969 (1991) (*quoting Hughes v. Oklahoma*, 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979)).

scheme, determining the constitutionality of Regulation 61–99 does not present " 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case....' " *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361, 109 S.Ct. 2506, 2514, 105 L.Ed.2d 298 (1989) ("*NOPSI*") (citation omitted). Nor will " 'the exercise of federal review of the question ... be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.' " *Id.; see Gordon*, 887 F.2d at 497 n. 2.

Abstention under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), applies predominantly to cases involving state criminal proceedings. *See Cinema Blue of Charlotte, Inc. v. Gilchrist*, 887 F.2d 49 (4th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1479, 108 L.Ed.2d 616 (1990); *Gordon*, 887 F.2d at 497 n. 2. *Younger* abstention may be proper in rare cases involving other state proceedings; however, none of the factors suggested in *NOPSI*, 491 U.S. at 364–73, 109 S.Ct. at 2515–20, exist here. Exceptional circumstances commanding abstention not being present, the district judge properly refused to abdicate federal jurisdiction over the constitutional questions. *See NOPSI*, 491 U.S. at 358, 109 S.Ct. at 2512.

11. HWTC has urged us to decide the case on the merits. We decline to do so as facts remain in dispute. *See Rum Creek Coal*, 926 F.2d at 359. For example, we have found confusing the posture of the EPA with respect to state activities considered permissible under 40 C.F.R. § 271.4 and its standards and procedures for withdrawal of state RCRA authority and refusal of Superfund money. In addition, it appears that the complexities inherent in the hazardous waste situation would make perilous any attempt to decide the case on the merits at the early preliminary injunction stage.

12. "Congress shall have the Power ... [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., Art. I, § 8, cl. 3.

If the challenged statute "clearly discriminate[s] against interstate commerce," *New Energy Co.*, 486 U.S. at 274, 108 S.Ct. at 1807, the court must strike it down, "unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." *Id.* at 274, 108 S.Ct. at 1807. Justifying discrimination is difficult to say the least. The Supreme Court's acceptance of such discrimination has been focused on commerce bearing the threat of death or disease. *See, e.g., Maine v. Taylor*, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986) (upholding Maine's prohibition on importing live baitfish because of the potential for destruction of Maine's fisheries); *Clason v. Indiana*, 306 U.S. 439, 59 S.Ct. 609, 83 L.Ed. 858 (1939) (upholding Indiana's prohibition on importing dead animals because of the potential for disease). In general, a " 'virtually *per se* rule of invalidity' " applies. *New Energy Co.*, 486 U.S. at 278–79, 108 S.Ct. at 1810 (*quoting Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978)); *Maine*, 477 U.S. at 148, 106 S.Ct. at 2452. " 'When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-ofstate interests, we have generally struck down the statute without further inquiry.' " *Healy v. Beer Institute, Inc.*, 491 U.S. 324, 337 n. 14, 109 S.Ct. 2491, 2499 n. 14, 105 L.Ed.2d 275 (1989) (*quoting Brown–Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986)). If, however, the statute "has only indirect effects on commerce and regulates evenhandedly," *id.*, the statute will be upheld unless the burdens are " 'clearly excessive in relation to the putative local benefits.' " *Maine*, 477 U.S. at 138, 106 S.Ct. at 2447 (*quoting Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)).

Congress, of course, may permit the states to engage in practices otherwise unconstitutional under the Commerce Clause. *Maine*, 477 U.S. at 138, 106 S.Ct. at 2447. Parties seeking to argue that Congress has authorized the otherwise invalid legislation face a heavy burden. The Supreme Court has held that before a federal statute will be so interpreted, "[a]n unambiguous indication of congressional intent is required," *Maine*, 477 U.S. at 139, 106 S.Ct. at 2447, congressional direction must be "unmistakably clear," *South–Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82, 91, 104 S.Ct. 2237, 2442, 81 L.Ed.2d 71 (1984) or "a clear expression of approval by Congress" must be shown. *Id.* at 92, 104 S.Ct. at 2243. That requirement is not idly commanded. Without the requirement, " 'the risk that unrepresented interests will be adversely affected by restraints on commerce' " "unacceptably increases." *Maine*, 477 U.S. at 139, 106 S.Ct. at 2448 (*quoting South-Central Timber*, 467 U.S. at 92, 104 S.Ct. at 2243). Nor may we idly disregard it. "[W]hen Congress has not 'expressly stated its intent and policy' to sustain state legislation from attack under the Commerce Clause, we have no authority to rewrite its legislation based on mere speculation as to what Congress 'probably had in mind.' " *New England Power Co. v. New Hampshire*, 455 U.S. 331, 343, 102 S.Ct. 1096, 1102–03, 71 L.Ed.2d 188 (1982) (citations omitted); *see South-Central Timber*, 467 U.S. at 92, 104 S.Ct. at 2242.

We first consider whether, in the absence of congressional action, the challenged parts of executive orders and statutes may violate the Commerce Clause. The argument, at the early preliminary injunction stage at least, that they do so is by no means devoid of merit. They appear facially to discriminate against out-of-state hazardous waste.[13] They compel in-state facil-

---

**13.** South Carolina has not attempted to argue that hazardous waste is not an object of commerce. The argument would appear untenable. *See Nat'l Solid Wastes*, 910 F.2d at 718–19.

Because the executive orders and statutes do not regulate evenhandedly but discriminate on their face against out-of-state hazardous waste,

the analysis used in *Pike* does not apply. *See Healy*, 491 U.S. at 337 n. 14, 109 S.Ct. at 2499 n. 14. *J. Filiberto Sanitation, Inc. v. State of N.J. Dep't of Envtl. Protection*, 857 F.2d 913 (3d Cir. 1988), cited by South Carolina, applied the *Pike* test to a county plan where the plaintiff failed to

ities to give preference to in-state waste, to reserve a specific amount of in-state capacity for in-state waste, to limit the acceptance of out-of-state waste to certain amounts, and to bar waste from specific states.

South Carolina has not banned all out-of-state waste but, on full development on the merits, that may prove to be of little relevance. *See Great Atl. & Pac. Tea Co. v. Cottrell*, 424 U.S. 366, 375, 96 S.Ct. 923, 929, 47 L.Ed.2d 55 (1976); *Nat'l Solid Wastes*, 910 F.2d at 720. South Carolina appears to have attempted "to isolate itself from a problem common to many by erecting a barrier against the movement of interstate trade." [14] *City of Philadelphia v. New Jersey*, 437 U.S. 617, 628, 98 S.Ct. 2531, 2538, 57 L.Ed.2d 475 (1978).

Act No. 196 bears a marked resemblance to an Alabama statute recently struck down by the Eleventh Circuit as violative of the Commerce Clause. The Alabama statute barred the acceptance of waste from states that either prohibited in-state disposal or treatment of the waste or had not signed an interstate or regional agreement to which Alabama was a party. *Nat'l Solid Wastes Management v. Alabama Dep't of Env't.*, 910 F.2d 713, 717 (11th Cir.1990), *as modified upon denial of reh'g*, 924 F.2d 1001 (11th Cir.1991), *cert. denied*, —— U.S. ——, 111 S.Ct. 2800, 115 L.Ed.2d 973 (1991). South Carolina's statute does not require that South Carolina be a signatory to the required interstate or regional agreement; however, it appears doubtful that the distinction, after full factual development, will prove significant. The Supreme Court has refused to vary "the strength of the bar against economic protectionism according to the size and number of in-state and out-of-state firms affected...." *New Energy Co.*, 486 U.S. at 276, 108 S.Ct. at 1809.

The rationales advanced for South Carolina's Act No. 196 seem insufficient, if the question were addressed at the preliminary injunction stage, to save it. Unlike many states that have attempted to pass reciprocity provisions, because South Carolina will permit the acceptance of out-of-state waste without regard to South Carolina's *actual* approval as signatory, Act No. 196 does not seem driven by concerns over other states' inferior standards that may jeopardize South Carolina's citizens' health. *See, e.g., Great Atl. & Pac. Tea*, 424 U.S. at 366, 96 S.Ct. at 925; *Dean Milk Co. v. Madison*, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951) (finding reciprocity provisions unconstitutional despite assertion of health standard rationale). South Carolina also may be unable to present more convincing support for the sort of conservation and preservation argument ultimately found unconstitutional in *Sporhase v. Nebraska*, 458 U.S. 941, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982). South Carolina's Act No. 196 seems to punish certain hazardous waste generators merely because they reside in states that South Carolina concludes have not fulfilled obligations under CERCLA § 104(c)(9). But South Carolina does not appear to have been empowered to place penalties on businesses in such states. *See Great Atl. & Pac. Tea*, 424 U.S. at 380, 96 S.Ct. at 932 ("Mississippi is not privileged under the Commerce Clause to force its own judgments as to an adequate level of milk sanitation on Louisiana at the pain of an absolute ban on the interstate flow of commerce in milk."). And it seems unlikely that South Carolina can penalize its own

---

show that the plan was protectionist placing the burden on out-of-state interests. *Id.* at 919–22.

**14.** Although we have remanded Regulation 61–99 to the district court, we note that the requirement that private groups seeking to obtain in South Carolina a permit to construct a new hazardous waste treatment facility must demonstrate "need" where "need" may not include out-of-state need (even that pursuant to a regional or interstate agreement to which South Carolina is a party) and must consider the reduction of in-state need by exportation, appears to be an

attempt to block South Carolina from the nationwide problem. On its face, Regulation 61–99 appears not to regulate evenhandedly. It permits South Carolina to refuse to allow new construction if all of its waste can be disposed of by exportation. The "practical effect," *Healy*, 491 U.S. at 332, 109 S.Ct. at 2497, of the regulation may be to favor in-state interests over out-of-state interests. All in all, however, the issue is too complex and possibly fact dependent to allow determination on the merits at the preliminary injunction stage.

citizens by prohibiting them from participating in interstate commerce with other states' citizens simply because that state has not met its obligations under CERCLA § 104(c)(9). The Commerce Clause protects those "engaged in interstate commerce." *Dennis,* 111 S.Ct. at 872. South Carolina's desire to have all states follow federal requirements for Superfund money is understandable, perhaps even laudable. It remains, after full factual development, to be decided whether such desire can be fulfilled at the expense of impairing the interstate commerce rights of individuals.

■ With respect to the remaining legislation, South Carolina seems unlikely to meet the burden of showing that burying in-state hazardous waste rather than out-of-state waste advances the health and safety of South Carolina citizens. "[T]here is no basis to distinguish out-of-state waste from domestic waste." *City of Philadelphia,* 437 U.S. at 629, 98 S.Ct. at 2538. South Carolina argues that it should be able to preserve its in-state capacity. The burden, however, "of conserving the State's remaining landfill space" should not fall disproportionately on out-of-state interests. *Id.* at 628, 98 S.Ct. at 2537. South Carolina has little inherent right to use capacity located within its borders solely for waste generated within its borders. *See New England Power,* 455 U.S. at 338, 102 S.Ct. at 1100 ("Our cases consistently have held that the Commerce Clause ... precludes a state from mandating that its residents be given a preferred right of access, over out-of-state customers, to natural resources located within its borders or to the products derived therefrom."); *City of Philadelphia,* 437 U.S. at 627, 98 S.Ct. at 2537 ("a State may not accord its own inhabitants a preferred right of access over consumers in other States to natural resources located within its borders"). South

Carolina may preserve the capacity by limiting *total disposal and treatment within the state without reference to whether instate or out-of-state waste is actually involved.*[15] But in a national economy filled with benefits and burdens, South Carolina may not be permitted to stop the flow of hazardous waste at its time of treatment and disposal at the borders.

Perhaps most importantly, the effect of every state designing particular limits and bars for out-of-state waste could be catastrophic. *See Healy,* 491 U.S. at 339–40, 109 S.Ct. at 2500–01. Indeed, such treatment of hazardous waste—in essence, ensured nontreatment of some hazardous waste—might destroy not only the theoretical principle of a national economic union, but contains the real potential to destroy land, if not also persons, within the union. Unless and until Congress alters the law, the apparent congressional intent of RCRA and SARA would seem to remain—better that hazardous waste be treated and disposed of somewhere, even if spread disproportionately among the states, than that future Superfund sites arise.

The challenged aspects of the executive orders and statutes, standing alone, may almost certainly prove to violate the Commerce Clause; however, South Carolina argues that either RCRA or CERCLA § 104(c)(9) authorize the otherwise invalid legislation. At the preliminary injunction stage, RCRA and CERCLA § 104(c)(9), however, do not appear to contain any language that indicates an unmistakably clear congressional intent to permit states to burden interstate commerce. *South-Central Timber,* 467 U.S. at 91–92, 104 S.Ct. at 2242–43; *Nat'l Solid Wastes,* 910 F.2d at 721–22. Moreover, South Carolina has not as yet presented evidence from the legislative history of the two statutes that demonstrate such congressional intent.[16] *Maine,*

---

**15.** As we understand CERCLA § 104(c)(9), so long as South Carolina has theoretical capacity for its generated waste, South Carolina can continue to meet the requirements by refusing to sign interstate agreements to import additional waste. As we have remarked earlier, once theoretical capacity has been ensured, CERCLA § 104(c)(9) does not address the problem of where the waste actually goes.

**16.** *Northeast Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.,* 472 U.S. 159, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985) does not indicate that the Supreme Court applies a different test to determine redefinition of the negative or dormant

477 U.S. at 139, 106 S.Ct. at 2447. As in *New England Power*, "[n]othing in the legislative history or language of the statute evinces a congressional intent 'to alter the limits of state power otherwise imposed by the Commerce Clause....'" 455 U.S. at 341, 102 S.Ct. at 1102 (citation omitted).

Lacking such support, South Carolina argues that the EPA's explanation of 40 C.F.R. § 271.4 is persuasive on this point. We are by no means prepared to accept that theory at the preliminary injunction stage as persuasive, nevermind, dispositive. EPA may deserve deference in its construction of its own regulations but it does not necessarily deserve deference with respect to whether Congress authorized it to permit states to violate the Commerce Clause.[17] As yet, no evidence indicates that Congress intended to permit the states, directly or by EPA authorization, to engage in actions otherwise violative of the Commerce Clause.

Furthermore, EPA's published position on § 271.4 does not suggest a contrary conclusion. After *City of Philadelphia* was decided, EPA adopted § 271.4 on May 19, 1980. The EPA explained the theory behind the section:

> This section provides that any aspect of a State program which operates as a ban on the interstate movement of hazardous waste is automatically inconsistent. A recent court decision, *City of Philadelphia*, 437 U.S. 617 [98 S.Ct. 2531, 57 L.Ed.2d 475] (1978), has held that such statutes are unconstitutional because they violate the interstate commerce clause, and EPA believes that decision is correct. However, since the text of RCRA speaks only to the "inconsistency" of State program submissions, not of

State laws generally, this provision is restricted to the same extent.

> EPA believes that State requirements which forbid the construction or operation of hazardous waste disposal facilities could be subject to attack by the same reasoning adopted by the courts that have struck down transportation bans. A State that refuses entirely to allow a necessary part of national commerce—the disposal of ·hazardous wastes-to take place within its boundaries is impeding the flow of interstate commerce just as much as a State that refuses to allow the transportation of those wastes. The interstate commerce concerns involved here are underlined by the establishment through RCRA of a national regulatory scheme, even though that scheme is not on its face preemptive. Accordingly, State programs which contain provisions that prohibit treatment, storage or disposal of hazardous wastes within the State will be deemed inconsistent if the prohibition has no basis in human health or environmental protection.

45 Fed.Reg. 53395 (1980). Thus, EPA's initial explanation of § 271.4 indicated that it intended to use the "consistency" prong of RCRA to refuse to authorize a state program if any aspect of it might prove unconstitutional under the Commerce Clause. Moreover, the initial statement implied that EPA intended to extend the reasoning underlying *City of Philadelphia* to in-state construction bans. Even if courts were to find such bans constitutional, EPA may have hoped to claim the authority to refuse to authorize programs containing them.

South Carolina notably glosses over the initial statement and relies heavily on

Commerce Clause. Extensive evidence about congressional intent through the legislative history of the bill was introduced. *Id.* at 168–73, 105 S.Ct. at 2550–53. Moreover, *Northeast Bancorp* employed the "plainly authorizes" rubric. *Id.* at 173, 105 S.Ct. at 2553.

**17.** *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1983) does not mandate or even suggest a contrary result. South Carolina quotes *Chevron*'s statement that "if the

statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782. Where no clear congressional intent to redefine the negative or dormant commerce clause can be found, an agency's answer that the negative Commerce Clause has been redefined is not "permissible." In such a case, Congress has not implicitly or "explicitly left a gap for the agency to fill...." *Id.*

EPA's position five years later.[18] Admittedly, EPA's interpretation of § 271.4 has "altered" somewhat. For example, the second EPA explanation describes the first statement: "The Agency stated that any aspect of the program which operates as a ban on the interstate movement of hazardous waste is automatically inconsistent. The Agency noted that this position was supported by a court decision, *City of Philadelphia v. New Jersey* ..." 50 Fed.Reg. 46438 (1985). However, the initial statement had implied that § 271.4(a) and EPA's decision that bans would be "inconsistent" was the *result* of *City of Philadelphia.*

Yet, in its later statement no longer does EPA seem to suggest that it will refuse to authorize programs containing laws or other elements that might be declared unconstitutional. Instead, EPA appears to have decided that not all restrictions would violate *City of Philadelphia*'s virtually *per se* rule of invalidity. EPA claimed,

> Section 271.4(a) does not by its terms prohibit any restrictions or impediments, only those that are unreasonable. Reasonable restrictions or impediments can logically include those that do not significantly decrease the flow of hazardous waste. Therefore, EPA does not agree that *any* disparity in treatment between in-State and out-of-State wastes is *per se* unreasonable.... [T]he preamble adopting this regulation did not state that EPA was relying on the Constitutional test for impremissible [sic] restraints on interstate commerce as the basis for finding restrictions or impediments unreasonable. The Agency is not required to adopt the Constitutional test for impediments or restrictions in interpreting its own regulations, and declines to do so here.
>
> More stringent requirements are expressly permitted [and] ... may have some adverse effect on interstate commerce. Different requirements are permissible if they are not inconsistent with the Federal program and approved State

programs.... The Agency does not believe that the mere existence of differences or disparities in treatment makes State programs inconsistent·*per se*.... Congress gave EPA the authority to interpret the term "consistent;" the Agency has interpreted the term in § 271.4 to prevent unreasonable restrictions or impediments in authorized programs. Nothing in RCRA section 3006(b) ... requires the Agency to adopt the Constitutional test as the test for consistency or unreasonable restrictions or impediments.

50 Fed.Reg. 46439 (1985). We are still unsure, however, of whether EPA was attempting to state (1) that some disparities might be constitutional, (2) that even if the disparities would be unconstitutional, EPA could approve the programs as "consistent," or (3) that EPA had the authority to permit otherwise unconstitutional state actions.

We need not struggle to resolve the import of the ambiguous second statement for the Constitution, RCRA, and the dictates of the Supreme Court sufficiently answer our problem. States may not engage in economic protectionism and RCRA appears to contain no clear statement or indication of legislative intent to permit states to override the Constitution. EPA may change its interpretation of its own regulation; however, we cannot change the commands of the Constitution and Congress. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781–82 n. 9, 81 L.Ed.2d 694 (1983).[19]

CERCLA § 104(c)(9) also does not appear to contain a clear authorization either in the statute itself or its legislative history. South Carolina argues that § 104(c)(9) authorizes it to guarantee in-state capacity. But § 104(c)(9) contains no such provision. Section 104(c)(9) requires an "assurance" of twenty-year availability of arranged ade-

---

**18.** The second explanation accompanied EPA's RCRA authorization of South Carolina's program despite that state's imposition of a fee differential on in-state and out-of-state waste.

**19.** The Attorney General, with EPA's Office of General Counsel, listed as "Of Counsel," though appearing as an *amicus curiae* in the present case, has raised no contrary contention.

quate capacity. It does not state that the state must ensure that hazardous waste actually is treated and disposed of either in-state or pursuant to an interstate or regional agreement. CERCLA § 104(c)(9) contemplates that adequate national capacity will exist if each state can assure that it has adequate capacity for in-state generated waste after taking into consideration out-of-state waste that it has agreed to import and in-state waste that it has agreed to export. However, no part of § 104(c)(9) appears to permit or require a state to limit its actual in-state capacity to in-state waste to receive Superfund money. *See* OSWER Directive 9010.00a at 4, 6. In fact, it appears that, if a state refuses to build in-state facilities or make alternate arrangements, it will be denied Superfund money, even if, in reality, all in-state generated waste is safely exported. If congressional intent had been to subject citizens of recalcitrant states to environmental danger by barring export of otherwise untreated and undisposed of hazardous waste, it could have been easily made clear: "A state not in compliance with this section may not export any waste." In the absence of such intent, we suspect that Congress believed the penalty of no access to federal Superfunds for waste cleanup would be sufficient. *See Nat'l Solid Wastes*, 910 F.2d at 721–22.

RCRA and CERCLA § 104(c)(9) do not appear to evince congressional intent to redefine the Commerce Clause. Long have we held that the Constitution "was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 523, 55 S.Ct. 497, 500, 79 L.Ed. 1032 (1935); *see Healy*, 491 U.S. at 336 n. 12, 109 S.Ct. at 2499 n. 12. The acknowledged problems of hazardous waste do not compel us at the preliminary injunction stage to abandon this vision.[20]

We have dealt at some length with the questions the parties, especially South Carolina, have to face when they proceed to a decision on the merits. We do not decide them but merely address the *Blackwelder* factors. We conclude that likelihood of irreparable harm to the plaintiff will be measurably greater if the preliminary injunction (as modified) is denied. Facts yet to be raised may differently invoke the controlling doctrine. *See Rum Creek Coal*, 926 F.2d at 367. " 'We hold only that the questions of fact and law raised on the record at this point are, under controlling doctrine, sufficiently serious and grave ones that, when considered with the balance of potential harms, the district court's injunctive order should stand pending trial.' " *Id.* (citation omitted). Accordingly, we remand in part to allow the district judge (1) to modify the order by striking the words that confusingly imply a declaration of invalidity, (2) to modify the order to apply only to the specific portions of the executive orders and statutes challenged as violating the Commerce Clause, and (3) to consider explicitly the balance of hardships with respect to Regulation 61–99. We affirm the remainder of the opinion.

AFFIRMED IN PART; REMANDED IN PART.

20. Because we find Commerce Clause analysis sufficient to justify the preliminary injunction, we do not consider the Supremacy Clause argument briefly addressed on appeal. The Privileges and Immunities Clause claim was not addressed by the district court and has not been argued on appeal. If the district court were to find the Commerce Clause requirement against Regulation 61–99 unlikely to succeed, the court should also consider these other claims of constitutional dimension.